UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**MATTHEW FARWELL,**<br><br>**Defendant.** | ) | **Case No. 24-cr-10259-DJC** |

**MEMORANDUM AND ORDER**

**CASPER, C.J.** **January 23, 2026**

## I. Introduction

A two-count superseding indictment charges Defendant Matthew Farwell ("Farwell") with killing a witness or victim in violation of 18 U.S.C. § 1512(a)(1)(C) (Count I) and engaging in conduct that violated 18 U.S.C. § 1512 and thereby caused the death of a child in utero in violation of 18 U.S.C. § 1841(a)(1), (a)(2)(A) and (a)(2)(C) (Count II). D. 63. Farwell has moved to transfer venue of his trial on these charges from the District of Massachusetts. D. 71. Having considered Farwell's motion papers, id., and the government's opposition, D. 78, and having heard oral argument from counsel, D. 86, the Court DENIES the motion.

## II. Background

The government has charged Farwell with killing Sandra Birchmore ("Birchmore"), who was allegedly pregnant at the time of her death. D. 63 ¶¶ 8-9. In this matter, as in any criminal case, the government's allegations against Farwell are just that, allegations, and have no evidentiary significance. At trial, the government bears the burden of proving every element of the charges against a defendant to a jury beyond a reasonable doubt.

The following summary is based upon the government's allegations. As alleged, between approximately March 27, 2012, and April 1, 2022, Farwell was an officer of the Stoughton Police Department (the "Department") in Stoughton, Massachusetts. Id. ¶ 1. At some point before he began his employment, Farwell was a volunteer with the Department's Police Explorers Academy program for local youth, id. ¶¶ 1, 3, and he became an instructor when he joined the Department, id. ¶ 3.

Birchmore began participating in Police Explorers Academy in approximately March 2010, when she was twelve years old. Id. ¶ 2. At some point before Birchmore turned sixteen, Farwell allegedly engaged in sexual intercourse and other sexual contact with her, which continued until sometime in early 2021. Id. ¶ 4. This allegedly occurred at times while Farwell was on duty with the Department. Id. ¶ 5. In approximately December 2020, when she was twenty-three years old, Birchmore learned she was pregnant and told Farwell he was the father. Id. ¶¶ 2, 6. On or around January 20, 2021, a friend of Birchmore's reported to the Department that Farwell had engaged in sexual intercourse with Birchmore and a Department employee informed Farwell about the call. Id. ¶ 7. As alleged by the government, on approximately February 1, 2021, Farwell killed Birchmore by strangulation and staged her apartment to make it appear as though she had committed suicide. Id. ¶ 8. The Massachusetts Office of the Chief Medical Examiner determined in March 2021 that Birchmore died by suicide. D. 71-1 at 2.

Relevant to the pending motion and as argued by Farwell, he seeks a change of venue because he contends that extensive media coverage means that he cannot get a fair trial in the District of Massachusetts. D. 71 at 14. Specifically, he points to the Boston Globe having run at least seventy-seven stories involving him since April 2022, including fifty-two "stories that substantially reference him or this case." Id. at 5; D. 71-2; D. 71-3; D. 71-7; D. 71-8; D. 71-9; D.

71-10; D. 71-11; D. 71-12; D. 71-14; D. 71-15. Farwell highlights that many of the post-indictment articles cite the contents of the affidavit of a Special Agent of the Federal Bureau of Investigation that the government submitted in connection with its motion to detain Farwell pending trial ("FBI affidavit"). D. 71 at 3-4, 16, 20; see D. 9-1. He alleges that various Globe readers have left more than 3,500 comments on relevant stories, "reflecting widespread public opinion that [he] is guilty and must be punished severely" and "show[ing] a strong bias against [him]." D. 71 at 8-9; see, e.g., D. 71-8. Farwell also observes that the Boston Herald has published twenty-seven articles that "referenc[e]" him, including ten articles regarding this case. D. 71 at 11; D. 71-13. Additionally, he notes that local television stations have also covered the government's allegations against him. D. 71 at 12-14. Finally, Farwell cites that a Massachusetts state senator has proposed legislation regarding "staged suicides" as a result of local press coverage regarding Birchmore's death. Id. at 10-11; see D. 71-12.

## III. Procedural History

On August 27, 2024, a grand jury indicted Farwell for killing a witness or victim in violation of 18 U.S.C. § 1512(a)(1)(C). D. 1. On August 28, 2024, the government moved to detain Farwell pending trial and submitted the FBI affidavit to support that motion, D. 9; D. 9-1, which in forty-five pages detailed the government's allegations against Farwell in this case. More recently, on October 28, 2025, a grand jury returned the operative two-count, superseding indictment. D. 63. Farwell now moves to transfer venue for the trial in this matter from the District of Massachusetts and requests that this Court transfer the case to the District of Rhode Island. D. 71. The Court heard the parties on this motion and took the matter under advisement. D. 86.

## IV. Discussion

### A. The Constitution Does Not Require Change of Venue

The Constitution provides that a criminal defendant must be tried before a jury in the state, U.S. Const. art. III, § 2, cl. 3, and judicial district, id. amend. VI, in which the alleged crime occurred. Given this constitutional scheme, therefore, defendants are routinely tried in communities in which the alleged crimes were committed, even in cases that have garnered some measure of pretrial, media attention, and it is a rare circumstance in which courts have concluded that the accused's right to a fair trial, id. amend. V, before an impartial jury, id. amend. VI warrants a change of venue.[1] See In re Tsarnaev (Tsarnaev II), 780 F.3d 14, 15 (1st Cir. 2015) (per curiam) (noting that "any high-profile case will receive significant media attention," that it is "no surprise that people in general . . . will be aware of it," but "knowledge, however, does not equate to disqualifying prejudice," and "distinguishing between the two is at the heart of the jury selection process" (citing Reynolds v. United States, 98 U.S. 145, 155-56 (1879)).[2] Accordingly, it follows that a presumption of prejudice requiring change of venue based on pretrial publicity is warranted

---

[1] In the motion, Farwell also cited the Eighth Amendment. D. 71 at 14. At oral argument, his counsel confirmed that the motion was no longer premised on the Eighth Amendment in light of the government's notice that it would not seek the death penalty in this case. D. 75.

[2] In the criminal trial of Dzhokhar Tsarnaev in this District arising from the 2013 Boston Marathon bombings, the First Circuit addressed the defendant's efforts to change venue on four occasions. In January 2015, the court denied Tsarnaev's application for a writ of mandamus regarding the trial judge's denial of Tsarnaev's second venue-change motion. In re Tsarnaev (Tsarnaev I), 775 F.3d 457 (1st Cir. 2015) (mem.). The next month, the court issued a per curiam decision denying a second mandamus petition. Tsarnaev II, 780 F.3d at 15. On direct appeal in 2020, as the parties note, D. 71 at 19 n.14; D. 78 at 2 n.1, the court explained that "if pressed to decide the venue question now, two [members of the panel] would likely find the judge abused no discretion in finding venue proper in Boston in 2015," but did not reach the issue as it remanded the penalty phase for retrial. United States v. Tsarnaev (Tsarnaev III), 968 F.3d 24, 56 (1st Cir. 2020), rev'd, 595 U.S. 302 (2022), on reh'g in part (Tsarnaev IV), 96 F.4th 441 (1st Cir. 2024). After the Supreme Court reversed the First Circuit's vacatur of the capital sentences, the First Circuit concluded that the trial court had not abused its discretion in denying Tsarnaev's venue motion, incorporating the reasoning of its 2020 decision. Tsarnaev IV, 96 F.4th at 447-49.

only in an "extreme case." Skilling v. United States, 561 U.S. 358, 381 (2010); see United States v. Misla-Aldarondo, 478 F.3d 52, 58 (1st Cir. 2007) (same); United States v. Moreno Morales, 815 F.2d 725, 734 (1st Cir. 1987) (suggesting that this applies only "in very extraordinary circumstances"); United States v. Sabhnani, 599 F.3d 215, 233 (2d Cir. 2010) (describing such cases as "very rare"). To assess a defendant's pretrial, presumption-of-prejudice argument, the Court generally analyzes three factors: "[(1)] the size and characteristics of the community, [(2)] the nature of the publicity, [and (3)] the time between the media attention and the trial." United States v. Casellas-Toro, 807 F.3d 380, 386 (1st Cir. 2015) (citing Skilling, 561 U.S. at 379, 382-84).[3] "Prejudice is presumed when a 'degree of inflammatory publicity ha[s] so saturated the community such as to make it virtually impossible to obtain an impartial jury.'" Id. (quoting Misla-Aldarondo, 478 F.3d at 58).

*1. The Size and Characteristics of the Eastern Division*

The jury pool for this case would be drawn from eligible individuals in the Eastern Division of the District of Massachusetts, which includes nine of the Commonwealth's fourteen counties. See Tsarnaev III, 968 F.3d at 43 n.14. The First Circuit observed in 2020 that the Division had "a population of about five million," id. at 54, and that the Boston metropolitan area, which is included in the Eastern Division, "is very large and diverse," id. at 55 (citing Skilling, 561 U.S. at 382 (noting that at time of trial, "more than 4.5 million individuals eligible for jury duty resided in the Houston area")); see D. 78 at 11 (discussing characteristics of Eastern Division). Data from the 2020 decennial census indicate that at that time, the total population of the counties in the

[3] The fourth Skilling factor, "whether the jury's decision indicated bias," Casellas-Toro, 807 F.3d at 386, is irrelevant to the pending motion given the case's pretrial posture.

Eastern Division was 5,339,618, with an adult population of 4,308,718.[4] Farwell eschews any discussion of this factor, see D. 71, but his counsel acknowledged at oral argument that the jury would be drawn from a large metropolitan area. The Court notes that "[g]iven th[e] large, diverse pool of potential jurors, the suggestion that 12 impartial individuals could not be empaneled is hard to sustain," see Skilling, 561 U.S. at 382, and, accordingly, concludes that the size and characteristics of the Division counsel against finding a presumption of prejudice.

2. *The Nature of the Publicity*

In support of his motion, Farwell has submitted numerous Globe articles, D. 71-2; D. 71-3; D. 71-9; D. 71-10; D. 71-11; D. 71-12; D. 71-14; D. 71-15, Herald articles, D. 71-13 at 4-20, 27-49, and one article from GBH News, id. at 21-26.[5] He also provided links to video news stories covering his arrest and the government's announcement of the indictment. D. 71 at 12-14. Farwell argues that the nature of this publicity supports a venue change because the local media has "broadcast[] photographs of [him] 'entering and leaving' [Birchmore's] apartment complex, according to the captions," and "pronounc[ed] that [he] got into an argument with Ms. Birchmore, that he was supposedly with her when her cell phone recorded its last steps, that he 'staged her suicide,' leaving 'minutes after,' and that he was the 'last person to see her alive.'" Id. at 16. He

[4] The Court draws this information from the United States Census Bureau's 2020 Census data tables, U.S. Census Bureau, Table P3: Race for the Population 18 Years and Over, https://data.census.gov/table/DECENNIALPL2020.P3?t=Age+and+Sex:Counts,+Estimates,+and+Projections:Population+Total:Populations+and+People:Voting+and+Registration&g=050XX00US25001,25005,25007,25009,25017,25019,25021,25023,25025 (last visited Jan. 23, 2026) (providing adult population data); U.S. Census Bureau, Table P1: Race, https://data.census.gov/table/DECENNIALPL2020.P1?g=050XX00US25001,25005,25007,25009,25017,25019,25021,25023,25025 (last visited Jan. 23, 2026) (providing total population data), and takes judicial notice of same.

[5] The Court has also considered Farwell's submissions regarding recognition the Globe has received for its reporting related to Birchmore, D. 71-5; D. 71-6; D. 71 at 4 n.6, but does not conclude that these submissions, even when considered in connection with the other media coverage, warrant a different outcome here.

also points to the FBI affidavit as "the predicate for much of the reporting" and "filled with irrelevant and inflammatory characterizations" of him. Id. at 17. Farwell further characterizes the FBI affidavit as "detail[ing] a cherry-picked version of alleged 'facts' and a one-sided narrative against [him]" and describes its contents as "containing headings with derogatory and inflammatory characterizations of [him], multiple levels of hearsay and other substantial grounds for objection," and "not [having] been ruled admissible by the Court." Id. at 3. The affidavit, as the government points out, was filed in connection with its motion for Farwell's pretrial detention and both were submitted consistent with "the practice in countless other criminal cases in this District" and "include information that is relevant . . . under the Bail Reform Act, 18 U.S.C. § 3142, *et seq.*" D. 78 at 3; see 18 U.S.C. § 3142(e) (requiring that "[i]f, . . . the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial").

Moreover, even "extensive knowledge in the community of either the crimes [with which a defendant is charged] or the putative criminal is not sufficient by itself to render a trial constitutionally unfair." Dobbert v. Florida, 432 U.S. 282, 303 (1977) (concluding trial was not unfair where trial judge denied motion to change venue and defendant was convicted of murder, child torture and child abuse).

Such is the case here. Having considered the materials Farwell submitted in support of his motion, the Court concludes that much of it primarily consists of reports of the government's allegations against Farwell, and typically notes that Farwell has pled not guilty to the charges and/or denies various allegations against him. See, e.g., D. 71-2 at 3, 9; D. 71-3 at 6; D. 71-9 at 8, 16; D. 71-10 at 4; D. 71-11 at 3; D. 71-12 at 3, 5; D. 71-13 at 5; D. 71-14 at 10; D. 71-15 at 3; see

United States v. Jamieson, 264 F. Supp. 2d 603, 605 (N.D. Ohio 2003) (concluding articles reporting positions of government as stated in indictment were not sufficiently inflammatory to create presumption of prejudice, and noting that some articles included defendant's denials), aff'd, 427 F.3d 394 (6th Cir. 2005). The Court notes that even the most evenhanded media coverage of criminal cases may still include inflammatory or salacious details, depending on the nature of the underlying allegations for the criminal charges. See, e.g., United States v. Mitchell, 752 F. Supp. 2d 1216, 1222 (D. Utah 2010) (noting, in a high-profile kidnapping case, that most of the labels of the defendant's acts or conduct as "evil" were related to testimony at pretrial proceedings or advocacy by the prosecutor during legal proceedings and although "the defense claim[ed] words such as disappearance, missing, rape, tethered, chained, and polygamy [were] inflammatory . . . they [were] nothing more than descriptions of the facts at issue in the case").

Certainly, some coverage submitted by Farwell contains at least a mix of reporting of the government's allegations against Farwell and commentary. See, e.g., D. 71-9 at 18, 21; D. 71-13 at 6, 30; D. 71-14 at 12. Further, this case is atypical from most criminal matters given the amount of media coverage spanning the two-plus years preceding the federal indictment and the state and local investigative activity during that period. Even when viewed collectively, however, the Court does not agree with Farwell that the nature and volume of media coverage have risen to the level that would warrant a change of venue. While Farwell points to certain coverage that claims to feature a photograph of him entering Birchmore's apartment building on the day the government alleges she died, see D. 71 at 7-8; D. 71-9 at 17; D. 71-10 at 5; D. 71-11 at 7, the Court does not agree that this is on par with the due process violations in Rideau v. Louisiana, 373 U.S. 723, 724-27 (1963) where the defendant's own confession was shown on local television three times before his trial went forward in the same community of approximately 150,000. Id. (reversing murder

conviction where small community in which trial was held "had been exposed repeatedly and in depth to the spectacle of [the defendant] personally confessing in detail to the crimes with which he was later to be charged" in televised "interview" with sheriff in which defendant did not have legal representation, which "kangaroo court proceedings" rendered actual trial mere weeks later "but a hollow formality"); see Estes v. Texas, 381 U.S. 532, 536-38, 550-51 (1965) (concluding criminal defendant's due process rights were violated where pretrial hearing involved "considerable disruption" by press broadcasting from the courtroom and four jurors had seen all or part of these broadcasts before the trial that began less than a month later). Moreover, the Court notes that much of the media coverage submitted by Farwell, though it may recite the government's allegations against him, focuses at least as much on perceived deficiencies in the Commonwealth's investigation into Birchmore's death. See, e.g., D. 71-14.

Farwell also highlights the Globe's June 2025 reporting that, "according to two people with knowledge of the case," Farwell did not impregnate Birchmore. D. 71-10 at 2; see D. 71-11 at 2 (noting that "[o]n first blush, [this] revelation seemed to blow a hole in the prosecution of Matthew Farwell for the murder of Sandra Birchmore" but then suggesting that it might not have this effect). Farwell points to this as prejudicial because it contains the reporters' speculation that "the damage to the government's case could be minimal." D. 71 at 7 n.7 (quoting D. 71-10 at 4 (reporting opinions of "[s]ome experts")). While some of this reporting is, at best, one-sided, the Supreme Court has concluded that similar coverage, on its own, does not create a presumption of prejudice. Cf. Sheppard v. Maxwell, 384 U.S. 333, 338-39, 355 (1966) (reversing denial of the habeas petition "[s]ince the state trial judge did not fulfill his duty to protect [the defendant] from the inherently prejudicial publicity which saturated the community and to control disruptive influences in the courtroom"); see Skilling, 561 U.S. at 380, 382 n.14 (noting that defendant's murder conviction in

Sheppard was upset "because a 'carnival atmosphere' pervaded the trial," not merely because of "heated reporting pretrial," and emphasizing that Sheppard "involved media interference with courtroom proceedings during trial" (emphasis in original)).

Farwell has not met the high burden of demonstrating that pretrial publicity would prevent him from receiving a fair trial in this District. See Casellas-Toro, 807 F.3d at 386; see, e.g., United States v. Houlihan, 926 F. Supp. 14, 15 (D. Mass. 1996) (denying motion to transfer trial for killing with intent to retaliate from Boston to Springfield, even where Boston media had reported police speculation regarding defendant's involvement in charged offense and "some [publicity] was quite emotional"); United States v. Jacques, No. 08-cr-117, 2011 WL 1706770, at *1 (D. Vt. May 4, 2011) (denying venue motion even where "[m]edia coverage addressed every aspect of the case, including [the defendant's] alleged efforts to avoid detection by falsifying evidence, his long-time sexual abuse of a minor and his formation of an elaborate fictitious sex ring, of which [his deceased, twelve-year-old niece] was supposedly the next victim"); United States v. Keleher, No. 20-cr-019 (FAB), 2020 WL 4784749, at *12 (D.P.R. Aug. 17, 2020) (concluding media characterizations of defendant charged with fraud and bribery as "reprehensible, disgraceful, trust-eroding and selfish, 'Hurricane Keleher,' the largest earthquake to pass through the Department of Education" did not warrant a change in venue); United States v. Benzer, No. 13-cr-00018-JCM, 2014 WL 7359078, at *14 (D. Nev. Dec. 24, 2014) (noting that news report generating "the most serious concern for potential prejudice" was one article regarding one defendant's proffer sessions with government, published four months before scheduled trial date, but concluding voir dire was appropriate to identify impact of news coverage); United States v. Quiros, No. 19-cr-76, 2020 WL 519807, at *9 (D. Vt. Jan. 28, 2020) (concluding transfer was not warranted, despite years of local media coverage discussing defendants' alleged fraud, because overall coverage did not present

"the kind of vivid, unforgettable information" that "would lead inevitably to an unfair trial" (internal citation and quotation marks omitted)); United States v. Bowers, No. 18-cr-292, 2022 WL 825437, at *2 (W.D. Pa. Mar. 18, 2022) (concluding that a presumption of prejudice was unwarranted because "[w]hile one would not describe the publicity as advantageous to Defendant, it [fell] far short of the grossly damaging coverage present in cases in which a change of venue was constitutionally required," citing Rideau, 373 U.S. at 723, and the "initially feverish media attention ha[d] cooled markedly over time").

To the extent Farwell separately relies upon comments posted to local news sites, D. 71 at 14, 17, 22, these do not compel a different conclusion, particularly where the Court has no basis to conclude that the largely anonymous commenters even reside locally and even assuming the 3500 comments cited by Farwell, id. at 8, were each written by 3500 individuals (which the record suggests they are not, see, e.g., D. 71-3 (indicating multiple comments by some individuals with the same handle)), that number would represent .07% of the approximately five million people in the Eastern Division.[6] See United States v. Philpot, 733 F.3d 734, 741 (7th Cir. 2013) (rejecting argument that reader comments revealed prejudice against defendant because "few readers would take the comments section of an online news story to be anything but mostly-anonymous opinions"); United States v. Mujahid, No. 09-cr-00053-TMB-DMS, 2011 WL 13250643, at *6 (D. Alaska Sept. 23, 2011) (explaining that court was "doubtful that [certain] anonymous comments—which [were] fraught with grammatical errors and inane banter—[were] truly indicative of the views of the local community"); Jacques, 2011 WL 1706770, at *8 (noting that the fact that "there

[6] Farwell also notes that the Globe claims "a cumulative reach of over 1 million readers" and approximately 774,100 followers on the social media platform X. D. 71 at 4 (internal citation and quotation marks omitted). Yet, this is still a minority of people in the Eastern Division, even assuming that there is no overlap between the figures and that each reader and follower is an individual residing in the Division.

are individuals with access to the Internet who are willing to post their strong opinions about the case does not provide evidence that potential jurors in the [district] believe [the defendant] is guilty"). Finally, the Court is not persuaded that a state senator's reference to Birchmore in introducing legislation regarding investigations of deaths of domestic violence survivors, D. 71 at 14, 22; 71-12 at 3, changes the outcome here. See, e.g., Jacques, 2011 WL 1706770, at *2 (declining to transfer venue where the "crime sparked sweeping reform of [state] laws pertaining to sex crimes, sex offenders, and registration for sex offenders" and state legislative hearing process included testimony from woman who alleged defendant raped her when she was a minor).

*3. The Passage of Time*

The trial in this case will not begin until October 5, 2026, D. 58, at which point more than five-and-a-half years will have elapsed since the alleged crime, D. 63 ¶¶ 8-9; see Tsarnaev III, 968 F.3d at 56 (considering time "between the crime and the trial" and noting that passage of two years "cut[] against a venue change"). Further, more than two years will have passed since the government filed the original indictment on August 27, 2024, D. 1, and the filing of the FBI affidavit, D. 9-1, and Farwell's arrest the next day, and close to two years will have elapsed since the Globe published the two-part story that Farwell quotes extensively for "examples of . . . prejudicial content," see D. 71 at 6; D. 71-9. This suggests that much of the risk of any prejudicial effect of same, if any, will have dissipated by the time jury selection begins. See United States v. Savage, No. 07-550-03, 2012 WL 2376680, at *5 (E.D. Pa. June 25, 2012) (noting, in a case in which charges against defendant included violation of 18 U.S.C. § 1512(a), that law enforcement statements in media "describing [defendant] as 'pure evil' and 'vicious, vindictive and hateful' [were] arguably inflammatory" but impact was lessened by passage of time and, therefore, weighed against any finding of presumed prejudice); United States v. Diehl-Armstrong, 739 F. Supp. 2d 786, 803 (W.D. Pa. 2010) (noting that the "fact that the more potentially

prejudicial stories ran approximately two years or more prior to the date on which jury selection is scheduled to commence is important because this significant lapse in time may well diminish or eliminate altogether any prejudicial effects that might have otherwise existed").

Farwell argues that the Globe's coverage "continues to this day, and will increase substantially as trial approaches" and that the Herald "will likewise continue to write stories, as will the local television news stations." D. 71 at 16. Even assuming that this case continues to be of interest to the media, however, future press coverage of these proceedings, without any indicia of prejudice in the substance of the coverage itself, would not be sufficient to establish a presumption. Compare Misla-Aldarondo, 478 F.3d at 58 (explaining that "[m]erely a high volume of media coverage is not sufficient to presume prejudice, if that coverage is factual, as opposed to inflammatory") with Casellas-Toro, 807 F.3d at 388 (presuming prejudice where there was "'[m]assive' and 'sensational' publicity blanketing the community for two years before trial; extensive reporting on the defendant's conviction by a jury, of an intertwined, heinous crime; [and] televised sentencing only two months before voir dire").

*4. Other Factors Considered in Tsarnaev III*

Apart from the Skilling factors, the panel majority in Tsarnaev III discussed several other considerations as to the motions to change venue there. Tsarnaev III, 968 F.3d at 54-56. Farwell argues that some of these distinguish that case from his, see D. 71 at 19, and while the Court agrees, it does not believe that that these distinctions support a change of venue here. First, Farwell emphasizes the First Circuit's recognition "as an important consideration on the venue transfer motion that Tsarnaev did not contest his guilt" whereas Farwell maintains his innocence, id., but the significance of this information for lower courts evaluating such motions is unclear, considering that this fact was apparently unknown to the trial judge when he considered the

motions. Tsarnaev III, 968 F.3d at 53, 55 (explaining that "most of the publicity was true – something we now know from Dzhokhar's guilt admission in his lawyer's guilt-phase opening and closing statements" and noting that fourth venue motion was orally denied on first day of trial). Farwell also highlights the observation by the First Circuit that Tsarnaev was "not a case where almost everybody locally knows something and very few elsewhere know of it," id. at 55; D. 71 at 19, but the court's discussion of this was in the context of survey and other data showing, for example, similar attitudes regarding Tsarnaev's guilt in Boston as compared to other proposed venues, see, e.g., Tsarnaev III, 968 F.3d at 55 (noting that in "Springfield, [Massachusetts, which is in the Western Division,] 51.7% said Dzhokhar was 'definitely guilty' and 32.2% said he was 'probably guilty' based on the pretrial publicity, compared with 47.6% and 44% in Manhattan, and 57.8% and 34.5% in Boston"), which is not reflected in the record here.[7] Finally, the Court is similarly unpersuaded by Farwell's reliance upon the statement that a venue change in Tsarnaev was unlikely to be beneficial to the defendant because "the Boston Marathon bombing would likely be viewed 'as an attack on all of America (as [Tsarnaev] himself did).'" Id. at 19 (quoting Tsarnaev III, 968 F.3d at 56). The First Court made this point to rebut Tsarnaev's "chief argument – that the nature of the crime (terrorism) might be viewed as an attack on the Boston community specifically," Tsarnaev III, 968 F.3d at 56, presumably prejudicing the jury pool. The context of this case, however, is markedly different. No matter how serious the allegations against Farwell, they cannot be reasonably viewed as an attack on the whole of Boston or the Eastern Division in

[7] While not determinative of whether transfer to a venue outside of the District of Massachusetts is warranted, the Court notes that the District of Rhode Island does not appear to be beyond the reach of Boston's local media coverage. For instance, one of Farwell's exhibits indicates that the Globe holds itself out as "New England's leading source for breaking news and analysis," D. 71-4 at 2, suggesting that the coverage Farwell takes issue with here in this District may have reached readers in his requested venue as well.

the way that a terrorist attack arguably could be. Cf. Tsarnaev III, 968 F.3d at 109-11 (Torruella, J., concurring in part and concurring in the judgment) (noting that "[a]lthough the impact of the defendant's crimes was felt nationally and internationally, the destruction was acutely felt by the residents of the Eastern Division," the "physical, psychological, and emotional trauma of these events was long felt locally" and "to the residents of the Eastern Division, the Boston Marathon bombings were an attack on them" (emphasis in original)).

For all of these reasons, based on the record before the Court, this case does not present the "rare, extreme circumstances" in which the Constitution requires a change of venue. Tsarnaev II, 780 F.3d at 18 (citing Rideau, 373 U.S. at 726).

**B. Transfer Is Not Required Under Rule 21(a)**

Similarly, a transfer of this case is also not warranted under Federal Rule of Criminal Procedure 21(a). Rule 21(a) provides that, "[u]pon [a] defendant's motion, [a] court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a). This "has been applied almost exclusively in cases in which pervasive pretrial publicity has inflamed passions in the host community past the breaking point." United States v. Walker, 665 F.3d 212, 223 (1st Cir. 2011).

The government does not address Farwell's separate Rule 21(a) argument, describing the rule only as the "mechanism for obtaining a change of venue based on pretrial prejudice." D. 78 at 4. Farwell does not specifically argue that the standard under Rule 21(a) is distinct from the constitutional standard, but he relies upon two Second Circuit cases and one case from the Northern District of Georgia to argue that transfer is required under the rule. See D. 71 at 20-22 (citing United States v. Maldonado-Rivera, 922 F.2d 934 (2d Cir. 1990); United States v. Livoti, 196 F.3d 322 (2d Cir. 1999); United States v. Moody, 762 F. Supp. 1485 (N.D. Ga. 1991)). Where "[t]he

parties . . . [did] not distinguish between a constitutionally-required, and a Rule 21-required change of venue, the First Circuit "assume[d], without deciding, that the analysis is the same" for change of venue under the Constitution and Rule 21(a). Casellas-Toro, 807 F.3d at 385 n.2; see Skilling, 561 U.S. at 378 n.11 (deciding venue issue only on constitutional grounds and noting that appellant did not raise a distinct Rule 21 challenge); see also United States v. Warren, 989 F. Supp. 2d 494, 498 (E.D. La. 2013) (noting that "Skilling footnote 11 suggests Rule 21(a) permits venue transfers that are not constitutionally required, but the cases cited by the Supreme Court do not suggest the rule involves a different baseline standard").

Assuming *arguendo* that the standard under Rule 21(a) is distinct from the constitutional standard, transfer is not required here because the Court is not "satisfied that so great a prejudice against [Farwell] exists" in this District that he "cannot obtain a fair and impartial trial" here. See Fed. R. Crim. P. 21(a); Mitchell, 752 F. Supp. 2d at 1219, 1228-29 (relying on constitutional analysis for Rule 21 purposes and concluding defendant had not demonstrated transfer was required prior to completion of juror questionnaires, in case where parties had "agree[d] that the constitutional standard . . . is a heightened standard to that required under Rule 21"). To the extent Farwell presses additional arguments under Rule 21(a), the Court is not persuaded that a different outcome is warranted. Farwell argues, relying upon the Second Circuit's focus on the government's contribution to pretrial publicity in Maldonado-Rivera, 922 F.2d at 967 (concluding that the denial of a pretrial motion to change venue was not an abuse of discretion), that "much of the source of this pretrial publicity stems from the publicly filed FBI [a]ffidavit and other [unspecified] law enforcement and governmental sources." D. 71 at 20. The Second Circuit has recognized, however, that "legitimate advocacy at a court proceeding—even advocacy resulting in adverse pretrial publicity—does not constitute conduct for which the government is properly

held responsible in a Rule 21(a) inquiry." Sabhnani, 599 F.3d at 232 (noting that "the prosecution's statements regarding the character of the crimes were proper in the context in which they were made: bail hearings in which the prosecutors were arguing that the [defendants] were a danger to the victims and their families, justifying an order of pretrial detention"). Nor is the Court persuaded by Farwell's reliance upon Moody, D. 71 at 21-22, a case that involved federal investigators making "so much of the evidence against [the] defendant . . . available to the media" before indictment "that an unnamed federal judge was quoted . . . as warning of the harm [to the defendant's opportunity for a fair trial] from such disclosures." Moody, 762 F. Supp. at 1489. Transfer is not required here based on the government's filing of the FBI affidavit in support of its motion for Farwell's pretrial detention for the reasons discussed above. Moreover, the Court trusts that as this case moves forward to trial, the government will, in its own words, "scrupulously refrain[] from disclosing in public filings additional information that could be viewed as arguably inculpatory." D. 78 at 3. Finally, ensuring that Farwell receives a fair trial will involve effective jury voir dire, which will be the subject of further discussion with counsel in the later, pretrial phase of this case.

## V. Conclusion

For the foregoing reasons, the Court DENIES Farwell's motion for transfer of venue, D. 71.

**So Ordered.**

/s Denise J. Casper
Chief United States District Judge