UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,
Plaintiff,

v.

MATTHEW FARWELL,
Defendant.

Criminal Action No: 1:24-cr-10259-DJC

January 20, 2026
11:00 a.m.

# TRANSCRIPT OF MOTION HEARING

BEFORE THE HONORABLE DENISE J. CASPER

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

1 COURTHOUSE WAY

BOSTON, MA 02210

JESSICA L. BISAILLON, RPR, CRI
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5200
Boston, MA 02210
jsteno99@gmail.com

APPEARANCES:

FOR THE PLAINTIFF:

UNITED STATES ATTORNEY'S OFFICE
District of Massachusetts
By: Torey B. Cummings, Esquire
By: Elizabeth Riley, Esquire
By: Brian Alexander Fogerty, Esquire
One Courthouse Way, Suite 9200
Boston, Massachusetts 02210
617.748.3281
torey.cummings@usdoj.gov
elizabeth.riley2@usdoj.gov
brian.fogerty@usdoj.com

FOR THE DEFENDANT:

CAPITAL RESOURCE COUNSEL PROJECT
By: Kimberly C. Stevens, Esquire
1071-1 Tunnel Road, Suite 10 #215
Asheville, North Carolina 28805
336.575.4337
kim_stevens@fd.org

FEDERAL PUBLIC DEFENDER OFFICE
By: Tara Allen, Esquire
By: Sandra M. Gant, Esquire
51 Sleeper Street, 5th Floor
Boston, Massachusetts 02210
617.223.8061
tara_allen@fd.org
Sandra_Gant@fd.org

RHODE ISLAND PUBLIC DEFENDER
By: Joanne M. Daley, Esquire
10 Weybosset Street, Suite 300
Providence, Rhode Island 02903
401.528.4281
joanne_daley@fd.org

P R O C E E D I N G S

(The following proceedings were held in open court before the Honorable Denise J. Casper, United States District Judge, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, 1 Courthouse Way, Boston, Massachusetts, on January 20, 2026.)

THE CLERK: All rise.

(The Court entered the courtroom.)

THE CLERK: Court is in session. Please be seated.

Criminal Action 24-10259, United States v. Matthew Farwell.

Would counsel please state your name for the record?

MS. CUMMINGS: Good morning, Your Honor. Torey Cummings on behalf of the United States.

MS. RILEY: Good morning, Your Honor. Elizabeth Riley for the United States.

THE COURT: Good morning.

MR. FOGERTY: Good morning, Your Honor. Brian Fogerty on behalf of the United States.

MS. STEVENS: Good morning, Your Honor. Kim Stevens for Matt Farwell. We have Matt Farwell at counsel table, Joanne Daley, Sandra Gant, Tara Allen and Abby Pandya.

THE COURT: Good morning to all of you.

Good morning, sir.

THE DEFENDANT: Good morning, Your Honor.

THE COURT: Counsel, sir, I know we're here on Mr. Farwell's motion for a change of venue. I've had a chance to review the papers, including the exhibits attached on the defendant's side. I'm prepared to hear argument.

Counsel?

MS. STEVENS: Thank you, Your Honor, and may it please the Court. Your Honor, we prepared a hard-copy binder with all of the exhibits in the event it would be useful to the Court if we direct the Court to certain pages of the exhibits during the argument.

THE COURT: Sure. You can hand it up.

MS. STEVENS: Yes. May we approach?

THE COURT: Counsel.

MS. STEVENS: Thank you, Your Honor.

One might ask if venue was not transferred in the *Tsarnaev* case, how can we move for venue to be transferred in this or in any other case arising in the First Circuit for that matter?

And we would point out for the Court that the circumstances of *Tsarnaev* were surprisingly narrow. Actually, when we review the opinions, two of them, on direct appeal, the trip to the U.S. Supreme Court, the trip back to the First Circuit, and then on remand, the court took pains to point out why factors such as the *Skilling* test did not impede their decision in this case and facts that are certainly relevant to

Matt Farwell's case.

In the U.S. Supreme Court, the court held that it was not an abuse of discretion. And that would be the standard on appeal, of course, Your Honor, whether the court has discretion here and whether the court abused discretion.

The First Circuit noted that that standard of review is an uphill battle for the defense and is a different standard than what we face here today in the trial court.

The U.S. Supreme Court found that it was not an abuse of discretion to fail to move venue in that case where Judge O'Toole took questionnaires with a hundred submitted questions from counsel for both sides at jury selection. He brought in over 1,300 jurors who filled out that questionnaire.

After that, he whittled the panel down to some 250 jurors. He subjected the jurors to individual questioning. He allowed follow-up questioning by both sides often and conducted 21 days of jury selection. And with those safeguards in place, the U.S. Supreme Court found that there was no abuse of discretion in failing to transfer venue in that case.

But we can look to the wisdom of Judge Torruella in the concurrence of the 2020 direct appeal where he examined factors, and he examined the *Skilling* factors, too, relied upon by the government.

And what he noted was, in that case, in the *Tsarnaev* case, the public knew just as much whether they were in

Springfield, Massachusetts, or whether they were in New York City.

Most importantly, the court noted that *Tsarnaev* himself admitted guilt. His counsel, Judy Clarke, at the beginning of the opening statement said it was him, admitting guilt. And by admitting guilt, the court found in the First Circuit 2020 opinion that much of the publicity was true, and his admission of guilt established that fact.

THE COURT: But, counsel, for those -- for the purposes of analysis here, isn't only the fourth *Skilling* factor looking at what eventually happens with the jurors as opposed to the other considerations that are looking at the pretrial situation?

MS. STEVENS: That's a factor I've been studying for weeks, Your Honor. And thank you for the question.

If prejudice is to be presumed, we never get that far. That's an economical use of the proceedings. Jury selection is lengthy. It's expensive.

And in *Casellas-Toro*, the First Circuit examined whether we should get to that stage, whether we should get to looking at how the jury questioning actually came to bear, whether it showed actual prejudice.

And some courts have used that factor, if we proceed all the way to jury selection, to then engage in a hindsight analysis of whether the jurors' answers showed that they could

proceed to trial without a presumption of fairness.

But this question before this Court at the earliest instance -- we have filed no other motions in the case, no significant motions in the case. And, in fact, Rule 21(d) requires that the motion to transfer venue be done at or before the arraignment unless the court gives us a later date.

We filed this motion at or before the arraignment on the superseding indictment because it is a recognition of the fact that if we proceed properly on the legal analysis here, and, that is, whether the defense can bear the burden to show a reasonable likelihood that this community has been saturated with unfair, prejudicial pretrial publicity, then it is appropriate to move the case in the first instance before we ever get to that question of jury selection. No court that I've seen has held that any one of the four *Skilling* factors is alone dispositive.

For example, the first factor looks at the size of the community, but we know that cases around the country have transferred cases from Atlanta. Atlanta has a million more citizens than this district has, and the land mass of greater Atlanta is as big as the state of Massachusetts itself. And so size of the community is not alone dispositive. And, in fact, in *Casellas-Toro*, the First Circuit moved the case from the entire Commonwealth of Puerto Rico.

Puerto Rico has three million citizens. The court

noted that that is a unified and coherent community. But, Your Honor, it is three million citizens. And, nonetheless, the court found a presumption of prejudice that attached and moved the case.

THE COURT: But, counsel -- well, there are some other factors there that I think are distinguishable, right, in terms of the timing of the defendant's trial there. If I'm recalling correctly, that's the case where the defendant had been convicted of murder two months before jury selection started in that case.

MS. STEVENS: He had, Your Honor.

THE COURT: So I recognize the point that no factor is dispositive, but I'm not sure that factually that case is similar here. But I'll hear you.

MS. STEVENS: Sure. And while we're on that case, Your Honor, in *Casellas-Toro* and -- and we got to this in briefing and I can today here as well. They noted, specifically, yes, it is true that he had a trial in the Commonwealth of Puerto Rico first, but they noted that part of the prejudicial publicity was publishing to the potential jurors words of a purported confession and other emotional factors bearing on the case.

Judge Torruella noted that *Skilling* itself was about the fall of Enron, a corporation, as opposed to the emotional factors that are involved in this case here.

With regard to the words of the confession being important, that traces its roots back to *Rideau v. Louisiana*, the seminal transfer of venue case where they published video of Wilbert Rideau confessing unaided by counsel.

In this case, the press has published, as the Court has seen, photographs that the press claims are photographs showing Matt Farwell entering Sandra Birchmore's apartment on the night they say she was killed, leaving. And, most importantly, Your Honor, they draw the conclusion that he was in her apartment when her telephone stopped moving, therefore, he killed her. That is --

THE COURT: And if I'm recalling correctly, the photo you're referring to is of a masked individual that the government alleges is Mr. Farwell.

MS. STEVENS: It is.

THE COURT: Isn't that very different from the defendant's own words of confession?

MS. STEVENS: Here's why it is not different, Your Honor. It shows the caption unequivocally says Matt Farwell entering the apartment complex. And we will file a motion later in this case about other admissibility problems related to that recording, the authenticity and the time stamp that it bears is off, yet, the press prints that that demonstrates that he left the apartment minutes after -- those are quotes from their article -- minutes after leaving.

Matt Farwell wholeheartedly, undisputedly denies guilt in this case. Sandra Birchmore's death was an unfortunate death by suicide. And when we have issues as far apart as homicide, as the government alleged, versus suicide, as the defense contends, the facts of *Tsarnaev* are wholly different. And *Casellas-Toro* pointed back to *Rideau* and said broadcasting imagery that jurors are likely to be unable to shut from their minds, to be unable to take from their minds no matter how carefully this Court questions those jurors, imagery that they see is in their minds.

In addition, *The Globe Magazine* piece that is 18 pages long, cites to the fact, according to them, that Mr. Farwell spoke with law enforcement. And even in that article, Your Honor, they say portions of that statement are false -- portions of his statements are false, commenting on the press -- on the value of evidence that has not even been admitted in this courtroom, but words, nonetheless, combined with imagery that a potential juror would be unable to shut from their mind.

And so another question in *Tsarnaev* that the court grappled with, they said, were we to move this case anywhere else in the country, the citizens are most likely just as aware of the publicity because it was an attack on all of America.

And I, Your Honor, am from North Carolina. Thank you for having me here. But our hearts bled for Boston over that

attack. And that attack -- the court took pains to note and they quoted *Tsarnaev* himself -- was an attack on America.

And the court said, Where can we move the case to? That is wholly different from the case at hand. We ran a search just this morning. We proposed Providence, Rhode Island. That, of course, is in the Court's discretion if the Court finds a presumption of prejudice under Rule 21(a).

But, in Providence, Rhode Island, as of this morning, their main newspaper, *The Providence Journal,* has run not a single story -- not a single story about this case. And what that demonstrates is the facts here are facts that affect this local community.

Your Honor, we brought in the original of just one of the exhibits that we attached as Exhibit 13 to our documents, and it's quite striking in real life. It's a newspaper article at the very back page of Exhibit 13, and you see, "A Life for a Life."

And in that article, they quote a gentleman saying, "The accusation that a police officer killed his former student and then unborn baby strikes horror in every feeling heart."

One of the factors that the venue cases discusses is, is the publicity sensational? And I looked up the definition of -- of sensational. Causing very great emotion, excitement, or interest with shocking details. That is the nature of the publicity here when we have full-page covers claiming -- asking

for a life for a life.

THE COURT: And so, counsel, I guess a few questions on this point.

So I understand your point about the sensational nature. Some of that stems from the nature of the charges against Mr. Farwell. I would respectfully suggest that some of that arises from the nature of the course of investigation here --

MS. STEVENS: Yes.

THE COURT: -- which was, in my view of having reviewed the materials and the comments, as much fodder for the commentary and the coverage as the charges against Mr. Farwell in this matter. Doesn't that make a difference here?

MS. STEVENS: Your Honor, here's why it doesn't make a difference here. Yes. The government's valid pleadings in the case, such as the indictment, they are entitled to litigate their case, of course, and it is a case that involves an emotional subject matter. It is the airing and the broadcasting publically of the imagery, the fact that they claim that he gave a statement to law enforcement that may have had false statements; the fact that they claimed that he refused to provide a DNA sample or submit to a polygraph test.

Those recommendations were on advice of counsel, Your Honor, and that is -- that is taking away the value of Matt Farwell's right of counsel. It is the nature of the facts

that they are claiming to be established fact in this case before this Court could protect or determine whether those facts, if at all, are true, and whether they should be admitted and whether there are other objections to that evidence.

THE COURT: Understood, counsel. And, obviously, all of these are allegations at this point that the government will be put to their proof on, whether or not they can prove them beyond a reasonable doubt.

I want to get back to the commentary about the size of the population, one of the *Skilling* factors. I think five million or around five million has been the number that I think was reflected in the *Tsarnaev* record and I think is what has been cited by counsel here as the population of the Eastern Division.

Certainly I don't think the government disputes the number of *Globe* articles or *Herald* articles or other coverage, and certainly there were a number of comments by members of the public. But isn't that balanced against the five million people; meaning, isn't -- aren't the commentators on those articles suggesting they're following it a much smaller sample than the sample of the venire that the jurors for this case would be drawn from?

MS. STEVENS: Well, Your Honor, we have already talked about the fact that it's not a dispositive factor. Surely, as the Court points out, this is a large metropolitan area.

*The Globe* is the most respective source of -- the most respected source of media in this area. It reaches a million subscribers, 770 something thousand X members. And the stories that they publish reach a large audience. And they are of a local nature in character and of an emotional nature in character, and they've broadcast facts of this case which should not have been broadcast.

But, ultimately, Your Honor, we don't get to that question if we're at the stage early in the case where prejudice should be presumed. And it should here because it is comparative to the *Rideau* case where they have broadcast imagery that can't be removed from --

THE COURT: But the imagery there, if I'm recalling correctly, was the confession of the defendant who did not know he was being recorded. That was broadcast three times before trial in a community of 150,000 people. Isn't that markedly different than what we're talking about here?

MS. STEVENS: It's markedly different in terms of the size of the community, but not the prejudicial nature of what was aired. And if a case can be transferred from the island of Puerto Rico with three million people, three million citizens to take a jury panel from, this case, too, can -- we can find a presumption of prejudice and spare the Court the lengthy jury selection that the Supreme Court was contemplating or reflecting on that had happened in *Tsarnaev* to wade through

that prejudice.

Your Honor, we don't expect the coverage to stop. We expect it will only grow between now and trial. In fact, we saw in the Facebook postings this weekend of the "Justice for Sandra Birchmore" group, that they refused to stand out this morning so that I would not tell the Court that we had to walk past them, that they calculated to manipulate the outcome of what I could argue in court.

So, Your Honor, yes, this is a large metropolitan area. But if the presumption should be applied, the case can be moved now before we continue to engage in this. You know, the *Tsarnaev* team filed three motions to transfer venue as the publicity grew, two trips to *mandamus* to the Court of Appeals. We can avoid all of that here by recognizing the fact that what has been printed should not have been printed and it undermines the presumption of innocence.

Matt Farwell has a right to a fair trial, and I know this Court would take great pains to ensure that he receives that. But, as Justice Torruella noted in his opinion, this is about the jurors. And he says, I do not mean to imply that every juror was being disingenuous or deceitful in their self-declared impartiality, but our trust in their ability to disregard prejudicial information diminishes when the prior exposure evokes strong emotional responses.

And we have three sources of a measure to determine

just how strong that emotional response was. We have front-page coverage like we see here crying for, "A life for a life." We have public comments where people say, "A big oak tree would serve a valid purpose here."

In a state that has abolished capital punishment, there are comments crying for capital punishment. And that is the impact that the publicity has had on the readers.

Furthermore, there is legislation that has been proposed in the state, legislation in Sandra Birchmore's honor, to stop staged suicides. That assumes so many things, Your Honor. It assumes, as the government contends, that there was a staged suicide.

We cannot have trial by press. We cannot have legislation relying on the press assuming that the facts of this case will be proven when it is our position that Matt Farwell is not guilty.

Finally, we have statements from the editor of *The Globe* itself after Laura Crimaldi won an award for her reporting in her attempt to what she called "uncover the truth for Sandra Birchmore." The editor of *The Boston Globe* said that she was proud that their reporting has attempted to uncover the truth for Sandra Birchmore.

Truth can only be born out in a trial conducted in a court of law in their solemn proceedings with the protection of cross-examination, with the protections of this Court's

determination of the admissibility of evidence that has been aired.

The court in *Moody* in Atlanta talked about the fact that much of the evidence came from FBI agents and what they were saying.

Here, we have an FBI agent -- and this is repeated not just in this article, but others, Matthew Farwell, his guilt, his gun -- excuse me. Let me start over, Your Honor.

THE COURT: Sure.

MS. STEVENS: Matthew Farwell's gun and badge did not grant him authority to violate the Constitution and certainly didn't entitle him to sexually exploit, abuse, and rape a child before killing her and her unborn baby in an attempt to cover up his alleged crime.

You know, Your Honor, at that point, the use of the word "alleged" does nothing to take from the potential jurors' minds imagery of child rape, murder, killing of an unborn child. And you'll notice the use of the word "alleged" was not until the tail end of the sentence after the words of "killing," "rape," and "child."

It is the very nature of the publicity in the case, which has caused us to be at this point early in the proceedings moving that the Court find the presumption of prejudice that is inherent from this publicity and move this trial to the quieter, calmer location of Providence,

Rhode Island, where their main newspaper has not published a single story about this case.

At the end of the government's brief --

THE COURT: And so, counsel, I know this is the secondary part of your argument --

MS. STEVENS: Yes, ma'am.

THE COURT: -- since you're focused on the presumed prejudice and moving it out of the District of Mass. as opposed to focusing on moving it to Rhode Island. But, I mean, is Rhode Island beyond the reach of *The Globe* and *The Herald*?

MS. STEVENS: It is not.

THE COURT: Okay.

MS. STEVENS: It is not beyond the reach.

THE COURT: So isn't it similar in that way to *Tsarnaev*? I mean, obviously, *Tsarnaev* was a matter of national import and national awareness, but I -- what do you say to the part that Providence is still in New England?

MS. STEVENS: It is still in New England. And we tried to do a balance of choosing a location, perhaps equidistant for the witnesses in the case. And in doing so, Your Honor, we tried to move it close enough, yet far enough away.

While those publications may be in reach of the citizens of Rhode Island, the fact is Providence has its own paper. And the fact that their paper has chosen not to run a

single story proves that those who are most interested in *The Globe* and *The Herald* and the Massachusetts legislation's reach are the citizens of this district, that it matters more to them, the sensational aspect of a Stoughton police officer, as they claim in the paper, raping a child, killing her.

Your Honor, that's what a trial is for. Those are factors the people cannot take -- citizens cannot take out of their mind. And we see the emotional response in the reader comments there.

And so this Court would certainly be free to transfer the case even further. We do think that those media sources potentially reach the citizens of Rhode Island, but they have their own newspaper. The fact that it has published nothing indicates the local character and fascination and sensationalism that attaches to the story here in this Court's district.

Justice Frankfurter asked, How can fallible men and women reach a disinterested verdict based exclusively on what they heard in court when, before they entered the jury box, their minds were saturated by press designed to establish the guilt of the accused? That is what the press coverage has done here.

For two-and-a-half years before this federal indictment was brought until now, the press coverage has not stopped. They have been interested.

Your Honor, at the end of the government's brief, they talk about you should keep the case here because this is where Sandra Birchmore was born and raised and should have been protected.

That is an argument that speaks to an argument to the community; that this jury should factor in the wishes of its community; that it should protect its family members, its loved ones. Close to a violation of the golden rule, but how could they not feel that when they are claiming that the Office of the Chief Medical Examiner, that the Norfolk County District Attorneys, that the Massachusetts State Police have refused to prosecute a case that they claim should have been brought? That's what this trial will be about, Your Honor. But the citizens are hearing this argument. They're hearing ties and allegations of corruption and then --

THE COURT: But, counsel, doesn't all of this have to be balanced against the presumption -- the strong presumption in the Constitution that a crime be charged in the community in which it was allegedly committed?

MS. STEVENS: Your Honor, the Fifth and Sixth Amendment do start with that premise. Yes, they do. But the constitutional right and the constitutional motion, Rule 21(a), effectuates the constitutional due process rights. The constitutional motion belongs to Matt Farwell.

And so, yes, we start with that presumption. But when

the defense believes, as we do, that this motion must be brought to presume the prejudice based on what's already happened here in this jurisdiction, that Mr. Farwell has the constitutional right under the Fifth, Sixth Amendments, and Rule 21(a) to transfer the case.

THE COURT: And, counsel, in your papers, you had also evoked the Eighth Amendment. Is that an argument that you are abandoning given the notice here?

MS. STEVENS: We are, Your Honor.

THE COURT: Okay.

MS. STEVENS: The Eighth Amendment applied at the time and no longer does now that a notice of intent not to seek the death penalty has been filed. Thank you, Your Honor.

THE COURT: Thank you.

MS. STEVENS: Thank you, Your Honor.

THE COURT: Thanks.

Counsel, I'll hear from you.

MS. CUMMINGS: Thank you, Your Honor.

Change of venue is an extraordinary ruling that is rarely permitted. As Your Honor just mentioned, the constitutional presumption is that trials should be held where the crimes were committed, and defendants can only overcome that presumption if he can show extraordinary local prejudice will prevent a fair trial.

Such a showing requires extreme circumstances that are

not present here, and the defendant has not met his burden. He should be tried in this court in the District of Massachusetts.

Your Honor, of course, there has been press about this case. The defendant allegedly groomed a teenage girl when he was a police officer, believed she became pregnant with his baby when she was an adult, and then allegedly killed her in order to prevent her from reporting his crimes. He allegedly staged the murder as a suicide, and he went on with his life for over three years before he was indicted.

As Your Honor mentioned, the nature of the unique history of the investigation in this case also led to a great deal of media coverage. But the case law is clear that media prominence does not equal prejudice, and the law does not require that jurors be ignorant.

The Supreme Court has presumed jury prejudice on the basis of negative community sentiment and pretrial publicity in only three cases, and all three have circumstances that are very different from this case.

Your Honor, and --

THE COURT: Are you talking about *Rideau*, *Estes*, and *Sheppard?*

MS. CUMMINGS: I am, Your Honor.

And to my opposing counsel's point, a confession that is broadcast to tens of thousands of people on three occasions, as Your Honor mentioned, in a community of 150,000 people is

not the same thing as a photograph of the defendant allegedly.

THE COURT: Although my -- counsel, and correct me if I'm wrong, my memory is that that was true in *Rideau* and *Estes*, but I'm not sure that that was true in *Sheppard*.

MS. CUMMINGS: Your Honor, *Sheppard* was the case where there was the inquisition by the coroner of the defendant prior to being charged, and he was made to sort of stand in a pseudo trial without counsel. So the government's position is that that would be somewhat analogous there.

I think *Estes* was different in that there was no pretrial published confession, but the court's main thrust of the venue issues in that case involved the circus atmosphere in the courtroom because of all the cameras and things that, obviously, would not be present at a trial in this courtroom.

Very few defendants have been able to meet this high standard for presumed prejudice and get a change of venue. As my opposing counsel flagged, Dzhokhar Tsarnaev did not, despite multiple efforts. That case had far more media and publicity in this district than Farwell's alleged crimes.

THE COURT: And what do you say to your sister's argument -- and I don't think there can be any reasonable disagreement about that characterization of the coverage in *Tsarnaev*. But what do you say to your sister's argument that this case is of a more local concern, like the sensational nature and the coverage of it are more localized here and the

risk of prejudice is greater here than it would be even in a major city an hour away?

MS. CUMMINGS: Even assuming for purposes of your question, Your Honor, that that is true and that that would remain true in the nine months between now and -- and the trial, it still doesn't rise -- the media coverage here still doesn't rise to the level of extraordinary prejudice such that a venue change is necessary or appropriate.

This case is more analogous to the facts of the *Skilling* case, Jeffrey Skilling, the former CEO of Enron who wanted a change of venue from Houston, Texas, after defrauding hundreds of people in the Houston area resulting in the collapse of Enron and widespread community impact.

Also, in that case, Skilling's codefendant pleaded guilty three weeks before the trial, and that plea was well publicized by the media. And even after that, even after Skilling argued all of those factors, argued that the media vilified him, the coverage was biased against him, the Supreme Court still denied change of venue, holding there was no smoking gun evidence, like a televised confession, that would invite juror prejudgment.

Your Honor, the government cites a number of other sort of high-profile cases where there was significant publicity and the respective defendants were denied venue changes, including defendants in the 1993 World Trade Center

bombing, the defendant in the September 11th terrorist attack on the Pentagon who was tried in the Eastern District of Virginia, the Watergate defendants. The list goes on.

In the *Skilling* case, the Supreme Court held that heated pretrial publicity is not enough. The publicity has to be so inflammatory and so pervasive that *voir dire* can't be trusted to reveal juror prejudice, and that is not the situation here.

As Your Honor reflected, the Eastern portion of the District of Massachusetts is more similar to the Houston area where we have a large and diverse jury pool, unlike the small community in *Rideau* with 150,000 people, tens of thousands of whom had ostensibly seen the defendant confess on TV.

The nature of the publicity in this case is nowhere close to the circus atmosphere like *Estes* where there was TV equipment all over the courtroom or the bedlam that -- as the Supreme called it as in *Sheppard.*

Also, in *Sheppard*, the defendant was made to reenact the murder in front of the media and then was forced to testify in that hearing held by the coroner before he was charged.

This, Your Honor, frankly, is -- is far from the media coverage in *Tsarnaev* where the former mayor and former police chief of Boston said that the defendant should receive the death penalty in that case.

The third *Skilling* factor --

THE COURT: And what do you say to the case out of Puerto Rico that your sister referred to, *Casellas*, where I think -- I think there was a presumption found?

MS. CUMMINGS: Your Honor, I don't have that case in front of me right now, but I believe that was the one --

THE COURT: Where he had been convicted of murder.

MS. CUMMINGS: Yeah. He was convicted just two months prior, which -- which is not the situation, of course, here.

THE COURT: Well, I think your sister was pointing to the population of Puerto Rico, right, to make an analogy to the circumstances here.

MS. CUMMINGS: And I can certainly appreciate that, Your Honor, but I think as -- as opposing counsel also pointed out, we look at the *Skilling* factors altogether. Right? So it's the combination of the size and characteristics of this community, the nature of the publicity, and then also the passage of time between the crime and the trial, which was not something that the defendant focused on here. But the more time between the crime and the trial, the less compelling the argument for presumed prejudice.

I will note Rideau's trial was about two months after his crimes. Sheppard's was three months later. And the onslaught of the media attention in both of those cases was really intense.

By contrast, four years passed between Enron's

bankruptcy and Jeffrey Skilling's trial. By the time this case goes to trial, it will have been five-and-a-half years since the alleged murder of Ms. Birchmore and her unborn child.

Also, it's still nine months away and we don't know -- Your Honor, no one can predict what will happen with the media coverage between now and October. To address the defendant's allegations --

THE COURT: Well, assuming, as your sister does, I think, for the purposes of this argument, that it heats up at least at some point before trial, what do you say to that argument for this motion?

MS. CUMMINGS: For this motion, Your Honor, I say that it's premature and it's difficult to predict.

I will note, Your Honor, that economics is not one of the *Skilling* factors. It's not a basis for venue change. Just because *voir dire* -- we might have to think a little bit more about it and think about questionnaire -- questionnaires, it's not a basis to change venue at this point nine months away when we don't know what the media coverage is going to be between now and then.

I want to briefly address the defendant's allegations regarding the government's filings in support of Mr. Farwell's detention. What we filed contained what we needed to carry our burden under the Bail Reform Act, 18 United States Code 3142. We -- the government is interested in and obligated to protect

the community and ensure the integrity of these proceedings.

Simply because the evidence necessary to support a motion for pretrial detention based on dangerousness, obstruction, and risk of flight might be unfavorable to the defendant, does not render the government's filings inappropriate or inflammatory. As inconvenient as those facts may be, including Farwell's truths to the -- untruths to law enforcement, those are facts. That's not a basis to move this trial because the government was fulfilling its obligation to ensure that the community was protected and the proceedings were upheld with integrity.

THE COURT: Alleged facts for the purposes now, of course.

MS. CUMMINGS: Correct, Your Honor. I apologize. Alleged facts.

The defendant also tries to distinguish the *Tsarnaev* case by noting that Tsarnaev didn't contest his guilt. Your Honor, this point is a red herring. Tsarnaev pleaded not guilty at his arraignment just like Mr. Farwell did. So for that purpose, Mr. Farwell and Mr. Tsarnaev were similarly situated prior to trial in terms of maintaining that they were not guilty until defense counsel admitted guilt in the opening statement of Tsarnaev.

With respect to the state senator's bill concerning staged suicides, I mentioned a moment ago that prior to

Tsarnaev's trial, the former mayor and former police commissioner of Boston told the media that Tsarnaev should receive the death penalty.

Your Honor, certainly the state senator who proposed this bill should not be on the trial jury in this case. But as was true in the *Tsarnaev* case, news stories about individual public official's opinions of the defendant do not infect the entire community in a way that creates a presumption of prejudice that requires that the case be moved to a different location.

We still have nine months until trial. Media coverage could change between now and then. *Voir dire* is the best way to assess juror prejudice. The safeguards in place for *voir dire* procedures are sufficient to ensure an impartial jury in this case.

If there are members of the jury pool who have, for whatever reason, formed an opinion about Mr. Farwell's guilt or innocence and cannot be impartial, they will not be permitted to sit on this jury. This case is very different from the few cases where courts found prejudice and changed venue. There has been no public confession, no circus in this courtroom.

The defendant has not met his burden, and the Court should deny the motion to change venue. Matthew Farwell can and will get a fair trial in the District of Massachusetts.

THE COURT: Thank you.

Brief rebuttal, if you want it.

MS. STEVENS: Yes, Your Honor.

With the four factors of the *Skilling* test, I think we went through that. And the distinguishing factors here are the emotional nature of the publicity.

It was important that Mr. Tsarnaev admitted guilt. We will not. Mr. Farwell has entered a plea of not guilty, making the query into whether the facts that have been publicized are true or not.

With regard to the filings before Ms. Gant was even --

THE COURT: I guess the point on that is, at least from what was before the District Court at the time that he denied the repeated motions for change of venue, that was the same as it is with Mr. Farwell at this point. Obviously, the First Circuit gets to consider the -- the progress of the trial and the juror's decision. But for the purposes of the trial court's analysis, it's the same. Correct?

MS. STEVENS: That's a good point, Your Honor. He had not said that yet in the opening statement at the time they -- the trial court was analyzing the motions to change venue.

But our position was the rest of the First -- what the First Circuit discussed is still true, that that was an attack on America, that there wasn't a place to move the case to.

We are here at this legal moment in time on a legal standard. There is a split among the circuits about whether

the presumption is even rebuttable. The First Circuit has said in two separate cases, *Casellas-Toro* being one of them, assuming the case -- the presumption is rebuttable, we will look at what the jurors said and did during *voir dire*. But as a fundamental matter, this motion, the presumption of prejudice -- and we've met the standard of proof, a reasonable likelihood that the sensational and emotional material has been spread out there -- that prejudices Mr. Farwell's right to a fair trial, it's out there. And looking at this as a matter of legal principle, if we've established the presumption, then we move the case.

It is only if the presumption is rebuttable that we then go further into jury selection and that the Court of Appeals might have to take up an analysis of whether the jurors were accurate with you, Your Honor, about whether they could be realistically expected to take these matters out of their minds, and that's the difference here.

THE COURT: Thank you.

MS. STEVENS: Thank you.

THE COURT: Counsel, I appreciate the arguments on either side. I want to give it some further thought. Even though I've already read your papers, I'll go back to them with some of your arguments in mind today. I expect that I'll issue a decision and we'll go from there.

Thank you, counsel.

MS. CUMMINGS: Thank you, Your Honor.

THE CLERK: All rise.

(Adjourned at 11:43 a.m.)

\- - - - - - - - - - - -

CERTIFICATION

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of my skill and ability.

/s/Jessica L. Bisaillon
Jessica L. Bisaillon, RPR, CRI
Official Court Reporter

January 25, 2026
Date