UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>MATTHEW FARWELL,<br>Defendant. | Criminal Action No.<br>1:24-cr-10259-DJC-1 |

BEFORE THE HONORABLE M. PAGE KELLEY, MAGISTRATE JUDGE

DETENTION HEARING

Tuesday, April 28, 2026
9:55 a.m.

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts

Robert W. Paschal, RMR, CRR
Official Court Reporter
rwp.reporter@gmail.com

**A P P E A R A N C E S**

On behalf of the Government:

UNITED STATES ATTORNEY'S OFFICE
BY: ELIZABETH RILEY
TOREY B. CUMMINGS
BRIAN ALEXANDER FOGERTY
One Courthouse Way
Suite 9200
Boston, MA 02210
(617) 827-9003
elizabeth.riley2@usdoj.gov
torey.cummings@usdoj.gov
brian.fogerty@usdoj.gov

On behalf of the Defendant:

FEDERAL PUBLIC DEFENDER OFFICE
BY: JOANNE M. DALEY
KIMBERLY C. STEVENS
TARA ALLEN
10 Weybosset Street
3rd Floor
Providence, RI 02903
(401) 528-4281
joanne_daley@fd.org
kim_stevens@fd.org
tara_allen@fd.org

**P R O C E E D I N G S**

(In open court at 9:55 a.m.)

THE DEPUTY CLERK: Good morning. Just a reminder pursuant to Local Rule 83.3 of the general prohibition against photographing, recording, and rebroadcasting, violations of these prohibitions may result in sanctions.

Counsel, are you ready? Is everyone ready?

MS. DALEY: Yes, thank you.

MS. CUMMINGS: (Nods head.)

THE DEPUTY CLERK: Today is Tuesday, April 28, 2026. We are now on the record in Criminal Case Number 24-10259, United States v. Farwell, the Honorable M. Page Kelley presiding.

Will the parties please identify themselves for the record.

MS. RILEY: Good morning, Your Honor. Elizabeth Riley for the United States.

MS. CUMMINGS: Good morning, Your Honor. Torey Cummings on behalf of the United States.

MR. FOGERTY: Good morning, Your Honor. Brian Fogerty on behalf of the United States.

THE COURT: Thank you very much.

MS. DALEY: Good morning, Your Honor. Joanne Daley for the defendant, Matthew Farwell.

THE DEFENDANT: Good morning, Your Honor.

THE COURT: Good morning.

MS. STEVENS: Kimberly Stevens for Matthew Farwell.

MS. ALLEN: Good morning, Your Honor. Tara Allen, federal defender.

THE COURT: Okay. Good morning, everyone. Thank you.

All right. So we're here for a detention hearing, and I'll hear from the defense first.

MS. DALEY: Your Honor, to start, I would move into evidence, I believe without government's objection, Exhibits A through F. They were filed electronically yesterday under seal.

MS. RILEY: No objection.

THE COURT: Okay. They're deemed admitted.

(Exhibits A-F admitted into evidence.)

MS. DALEY: Thank you, Your Honor.

Your Honor, for the most part, I will rely upon the memorandum that we filed in support of Mr. Farwell's release. That was filed on March 26, 2026, and I'd like to take the opportunity now to respond to the representations made by the government in their memos opposing the defendant's release.

Understanding that the strength of the case is merely one factor this Court should consider and, frankly, not the most significant factor, I will start there, as the government has, I believe, focused much of their pleadings on

that issue.

Sandra Birchmore committed suicide. The government contends, of course, that she was killed. The prosecution is entitled to this opinion, certainly, but they are not entitled to their own facts; and they shouldn't use their bail memos to mislead the Court, the public, and the press about the evidence in this case.

Starting with the DNA evidence, the government writes, "While Farwell correctly states in his memorandum that his DNA was not found under Birchmore's fingernails, he fails to mention that Farwell's DNA was found on the ligature that tied Birchmore's neck to a closet door handle."

First of all, the defense did reference that DNA in a footnote in a memorandum; but continuing, the government writes, "The presence of Farwell's DNA on the murder weapon -- i.e., the strap used to asphyxiate Birchmore -- is, of course, highly inculpatory. Furthermore, Farwell's sperm cells were found in multiple locations on the underwear that Birchmore was wearing when she was found dead on February 4, 2021.

"The presence of Farwell's sperm in Birchmore's underwear renders it highly likely that he lied to Massachusetts State Police detectives during his brief interactions with them in the school parking lot on February 6, 2021, when he claimed that the last time he had

sex with Birchmore was in October of 2020."

The government writes, "This lie is relevant to Farwell's state of mind and his consciousness of guilt."

Starting with the DNA on that bag strap, again, we did reference it in our memorandum, but what's important to note is that it is not a match, as the government contends. And by the way, as was then reported verbatim in the press, literally the *Boston Globe* published a headline "Farwell's DNA found on murder weapon." That was a line written by the government, and it is misleading, at best.

There was a complex mixture of at least four contributors on that strap, and complex mixtures cannot be claimed to match any given individual.

What the government knows because, obviously, this was provided to the defense in discovery is that there is a probability that Mr. Farwell or someone in his paternal line was a contributor. And as the government well knows, Mr. Farwell and his twin brother were frequent visitors to Ms. Birchmore's home. And the government also represents that the defendant's brother had sexual relations with Ms. Birchmore -- with Ms. Birchmore.

The hand DNA or transfer DNA of these individuals or any of the other people who might be contributors is not even acknowledged by the government in their memorandum.

Next, the government acknowledges that Matthew

Farwell was excluded as the source of DNA under Ms. Birchmore's fingernails. This is highly exculpatory given the fact the government alleges both obviously in the indictment and in their memorandum that Ms. Birchmore was violently strangled with this strap and would presumably have attempted to resist or fight off her attacker.

The fact that Mr. Farwell is excluded as a match, as a contributor from the DNA under her fingernails, is highly relevant and exculpatory.

Next, the government makes the representation that Mr. Farwell's sperm cells were found in Ms. Birchmore's underwear, leaving out the fact that, according to the evidence, the DNA evidence, there was a complex mixture in one part of Ms. Birchmore's underwear with a sperm fraction with at least three contributors and another part of the underwear with a sperm fraction of at least four contributors.

That is the state of the science; and for the government to represent, first of all, that he is a match and, therefore, he must have been lying when he claimed to have last had relations with Ms. Birchmore in October is also not a fair representation, when it is, I would submit, known to defense attorneys and prosecutors alike, especially those who defend and prosecute sex crimes, that DNA, sperm cells, can remain in underwear for months, can remain there after

it's been laundered multiple times -- so, again, misleading.

Next, the government in its memo -- next, in its memo, the government alleges -- and I quote -- Farwell spread rumors about Sandra Birchmore's mental health struggles to insinuate -- Farwell spread rumors about Sandra Birchmore's mental health struggles and they, obviously, allege that he did this to insinuate that she committed suicide.

However, the government is well aware of Ms. Birchmore's unfortunate mental health struggles starting at age nine, when she was first prescribed psychiatric medication. The government knows that days before she died, she told her OB/GYN that she was struggling with depression and that -- with the side effects of her prescription and her dosage was changed.

The government knows that her mental health history dates back 14 years, that she had one prior suicide attempt, that she drafted at least one suicide note, that she created a list in her journals of ways to commit suicide, including using a rope, and that she'd been placed, obviously, prior to her death on antidepressants.

Finally, the government knows that on February 1, 2021, the date of her death, she googled, "What color is the suicide ribbon?"

Next, the government in their briefs respond to our position and the position of the Office of the Medical

Examiner of Massachusetts that this was a suicide. The OCME examined the evidence in this case, went to the scene, examined photos, and conducted the autopsy and concluded that Sandra Birchmore committed suicide.

That is still the opinion of the Office of the Chief Medical Examiner for the Commonwealth of Massachusetts, an office that to this day has jurisdiction over Ms. Birchmore's death. And their opinion has not changed despite the fact that the government has met with that office on at least two occasions in an attempt to get them to change their opinion, and they have not swayed. The government knows that the Office of the Medical Examiner to this day represents that the manner of death was suicide.

Beyond that, the government then met with, consulted with another forensic pathologist. This individual is the director of the Armed Forces Medical Examiner System. The FBI supplied materials to her. The agents and the prosecutors met with her. And she gave no opinion to contradict the finding of the OCME that Ms. Birchmore committed suicide.

With that having been told by at least two forensic pathologists that the manner of death was suicide, the government, six days after meeting with the federal medical examiner hired Dr. William Smock. He is not a forensic pathologist. He is a doctor of emergency medicine. He

treats the living, not the dead; and he is not even board certified in that specialty.

That is the state of the science in this case, two separate offices of forensic pathologists saying this was suicide and then an outside expert hired by the government representing that it was homicide.

I'm going to move on from the strength of the case, or the lack thereof, and then address the government's response to the defense pointing out other defendants in state and federal court charged with homicide who were released on conditions.

And I'm going to focus on one defendant in particular. That defendant is Brandon Mitchell Kelley. His case is referenced in our memo; and the government, obviously, responded to it.

Mr. Kelley is charged with felony murder, murder in the second degree. He is charged with killing his 59-day-old daughter by starving her to death. He was released by the Court in the Southern District of Georgia on August 20, 2025. That was two months before the United States announced that it would not seek the death penalty against him. He was released on a murder charge on conditions while the death penalty was still on the table.

And to just tell the Court more about Mr. Kelley, like Matthew Farwell, he was a US Army veteran. Unlike

Matthew Farwell, he did not receive an honorable discharge. His discharge was less than honorable.

Matthew Farwell is a decorated United States Army veteran. He is a decorated police officer. The commendations that I included as exhibits include his joint services commendation medal. The medals that I brought here today are for excellence and service, are for his dedicated service to life-saving actions as a Stoughton police officer, and as someone who literally put his life on the line every day in active duty disarming explosive devices.

He was honorably discharged and then continued to serve his state and his country in law enforcement. His ties are to the state of Massachusetts and nowhere else, as contrasted with Mr. Kelley.

Mr. Kelley, the defendant in Georgia, had no ties to Georgia. He had just moved there; and, in fact, the release plan proposed for Mr. Kelley, the one that was accepted and imposed by the Court, was that he be allowed to return to his home state of Colorado with his father as custodian.

We are asking the Court to allow Mr. Farwell to return to the home where he was living at the time he was arrested, where he had been living for -- I'm sorry -- to return to the community, not to live at the home where he was arrested, but to live with his mother, but to the community

where he was living, the state of Massachusetts, where he was living for his entire life.

Also, the government points out that Mr. Farwell -- well, let me get back to Mr. Kelley because this is relevant. Mr. Kelley at the time of his arrest told police officers that he would rather take a bullet than go to jail. So those are the factors about Mr. Kelley, Mr. Kelley who was released on conditions, allowed to return to the state of Colorado with his father as custodian.

The government in the Kelley case appealed the finding of the magistrate. They alleged in their appeal that Brandon Kelley was a danger, was a flight risk, and that the order should be revoked, and that was denied. The defendant was released.

The government alleges that the defendant in his phone drafted what they call a suicide note -- didn't act upon those -- that note, but that he drafted it in June of 2024, when national news stories came out alleging that this was a homicide and not a suicide.

What is relevant about that is not that there was a note in his phone that he never acted upon. It's that it supports the defense theory in this case that he is not a flight risk and he is not a danger.

He was arrested two months later. He was arrested in August. And between the time that he allegedly drafts

that note, a note he doesn't act upon, he continues to live his life. He continues to live with his wife and his children. He voluntarily gave up his job in law enforcement, voluntarily decertified, and he moved on with his life.

He got his CDL. He started his own business. And perhaps most significantly, he took out a large loan of at least $100,000 to pay for a truck. The ties that he had to the commonwealth only were strengthened in the days and months and years after Ms. Birchmore's suicide. That is not support for detention in this case.

And just as a matter of history in this court, in the Sheerer case, which was before this Court before Judge Levenson, Judge Levenson found that the fact that there was an expression of suicidal ideation of a defendant when he learned that he might face charges was not a factor the Court would consider in determining whether or not release was appropriate, and Judge Levenson did release that defendant, who was charged with, I believe, distribution of child pornography.

Which raises another interesting point the government made in their memo, and that is in their supplemental brief the government alleges that Mr. Farwell possessed adult pornography on his phone. They classify it as barely legal pornography, but barely legal is legal. And the government knows that because had Mr. Farwell possessed

child pornography, he would be charged with that.

So the government, again, using that information, which the defense submits is not a factor to be considered under the Bail Reform Act, is meant only to produce the headline that it produced, which was Mr. Farwell had teen pornography, because that is how the government chooses to portray it in its filings, to say that he's attracted to teenagers, when, in fact, what they found or they allege they found on his phone was adult pornography.

The government also discloses in their memo that they have evidence that Mr. Farwell engaged in other consensual extramarital affairs. Again, how that is relevant under the Bail Reform Act I don't know. It is not. It is not a crime.

And so the only conclusion that can be drawn, I submit, is including that in a memoranda was -- the government's intent was to destabilize his release plan or upend his home life, perhaps his relationship with family members. Well, that is not successful. Mr. Farwell's family supports and continues to support his release plan.

So why is the government including in their memoranda information that the defendant engaged in legal behavior? It is because they don't have evidence that he is a flight risk. They don't have evidence that he's a danger to the community.

And, in fact, I would submit that point is borne out by one line in the government's memo in which they write, "Farwell's ties to the community and years of service failed to stop him from sexually exploiting Birchmore and murdering her and her unborn child."

What is the relevance of that line? The ties to the community and the -- the factors that the Court determines obviously come after a defendant's arrest. They come after he's been charged with the crime. So the government saying his ties to the community didn't prevent him from committing the crime has no place in a bail argument because the factors exist to be addressed after the crime is allegedly committed.

But I submit that it is just further evidence that the government does not have evidence to support their claim that he's either a flight risk, a risk of obstruction, or a danger. And, again, on the issue of possible obstruction or witness tampering, there is no evidence of intimidation or witness tampering either prior to Mr. Farwell's arrest or after.

And as the Court well knows, the government has access to Mr. Farwell's jail records, his phone calls, his nonlegal mail -- not that suicidal ideation, we submit, should be considered as an issue in this case, but there's also no evidence that the defendant had -- has had any issues

at Wyatt for the last year and a half. And the government has access to his medical records and his mental health records.

He has been a stellar inmate, held under trying circumstances given his status as a former police officer; and not only has he had no disciplinary issues, no health concerns, no mental health concerns, he has been given a job at Wyatt cleaning the officers' toilets.

He is permitted access to places where only employees have access at Wyatt. That is something the Court should take into consideration in determining whether or not he is a risk or whether or not he can be trusted to follow this Court's instructions should he be released.

The government, in also referencing the other defendants who have been released by the federal courts having been charged with murder, also points out that, well, some of those defendants had proof problems with their cases. And this is where I'm going to end.

The government has proof problems with this case, and it's not for this Court to decide, but it is a factor the Court can decide, as those judges did in those cases, as the government acknowledges those judges did in those cases.

The science is on Mr. Farwell's side in this case, and that is why we are going to trial, to prove that he is innocent. And the white noise in the government's memoranda

that he had adult pornography, that he had consensual affairs, that he may have engaged in other illegal behavior that he's never been charged with despite an investigation, it is not relevant.

What is relevant is this is a defendant who stayed put when suspicions arose, when rumors were generated, when articles were written, when national articles were written; and unlike many others, he stayed. He met with law enforcement after a few days after Ms. Birchmore's death.

The government alleges that the defendant wiped his phone. No, he didn't. They know he didn't wipe his phone because they have his phone, and they have the adult pornography on his phone, and they have the evidence that he had communications with Ms. Birchmore.

What he didn't do was reset his phone, which is how one might wipe their phone, but he didn't do that. He met with them voluntarily. He spoke with them voluntarily, and he told them that he saw her on that date. He never denied that he was present at Ms. Birchmore's home, that he was there that day. They had an argument, that he ended things with her, told her he was not the father, and he left.

And Ms. Birchmore tragically took her own life and -- as she had threatened to do more than once in her life, as she had journaled about more than once in her life, as she googled about that day. And that conclusion that she

committed suicide is one that is affirmed by two separate forensic pathologists.

And, again, this is not the trial, but the defendant deserves the right to be out of custody to defend himself against these charges. His defense team has the right to be able to see them -- to see him, to prepare for trial, and for him to see us. He is at Wyatt right now.

The discovery in this case, Your Honor, is so voluminous. It is millions and millions of pages. Mr. Farwell gets two days a week at most, a couple hours per day, to review the discovery in this case. If he were released, even on home confinement, 24-hour lockdown, we would go to where -- his residence, and we would be able to meet with him.

And that is something the Court should consider for judicial economy, for the defendant's right to build a defense, the defendant's right to assist in his own defense.

These conditions are absolutely acceptable and will ensure his appearance in court, will ensure that he does not flee the jurisdiction, something he has no intention of doing, which, because by the way, he is also, as a disabled veteran, receives compensation from the state. And that is a form of income the Court can consider. The fact that he was employed at the time of his arrest is something the Court should absolutely consider.

But even if he cannot find employment while this case is pending before trial, he does have compensation from the federal government. And these are all examples of his ties to the community, reasons why he would not leave, would not leave his wife, would not leave his children, would not leave his mother.

But the Court should give him the opportunity to be out for the next five months -- five months -- to be at home, to meet with his attorneys, to prepare for his defense, instead of forcing him to be in a position that makes trial preparation all the more problematic, especially in a case with the level of discovery, discovery that is still being generated and turned over to the defense on a daily basis.

So I would ask the Court to consider that factor as well and release Mr. Farwell on the conditions that we suggest in our bail memo or any other conditions the Court deems appropriate in this case.

THE COURT: Thank you very much.

MS. RILEY: Good morning, Your Honor.

In August of 2024, the government moved this Court to detain the defendant, Matthew Farwell, pending trial. At that time, we submitted Exhibit Number 1, a detention affidavit from an FBI agent; and since, we have filed two supplemental briefs and filed a number of exhibits under seal that support some of the government's arguments today.

We would move to formally admit those exhibits under seal. I don't believe there's any objection, and we'd ask to be able to refer to them over the course of this argument.

MS. DALEY: No objection, Your Honor.

THE COURT: Okay. Those are admitted.

(Exhibits as referenced admitted into evidence.)

MS. RILEY: Thank you, Your Honor.

The government's case has only gotten stronger over the course of the last 20 months that the defendant has been detained. The district court judge has denied his motion for change of venue as well as his motion to dismiss. And we are now fast approaching the trial date where the defendant will be held accountable for his actions, and that accountability will come in the form of a mandatory life sentence.

This defendant raped a child, murdered her when she became an adult, and obstructed justice over and over again to attempt to avoid taking responsibility for his crimes. Despite that, he stands before this Court and asks to be released five months before his trial is set to commence, saying that he is not a danger.

I would imagine that it is a difficult task for the Court to balance a defendant's liberty rights, his rights to meet with his attorneys and prepare, his attorneys who, by the way, have the ability to travel to Wyatt to prepare with

him as much as they want, to balance that against the right of the community to be safe, the right of the government to ensure that wrongdoers are brought to justice, and the importance of the judicial process being free from obstruction and to retain its integrity.

Those are all factors that must play into this balancing act that the Court has in determining whether or not the defendant should be held pretrial. And I imagine that this Court sees a lot of close calls. This is not one of them. The probation department has recommended that this Court detain Mr. Farwell, and we agree.

Because this is a unique case and we are 20 months in and there has been a lot of filings and there are a lot of facts and because this Court could, frankly, comfortably detain the defendant under any of the prongs -- danger to the community, risk of flight, or risk of obstruction -- I am going to spend a little bit of time highlighting for the Court some of the facts that support our arguments for detention under each.

First, releasing the defendant would pose a serious risk of obstruction. In serious violent cases, we routinely ask the Court to detain criminal defendants prior to trial because they pose a risk of obstruction once they are criminally charged.

When they are faced with imminent consequences for

their actions, we do not need to ponder whether or not this defendant is capable of or willing to engage in the obstruction of justice. He has already done that in the most permanent way possible by murdering Sandra Birchmore, a witness to his crimes, and her unborn son, who he believed would be the physical evidence of his crimes.

We not only know that he is capable of obstructing justice, but this Court can be more confident now than ever that he did so to avoid criminal prosecution, echoing the elements of 18 United States Code 1512. And although defense may not understand the relevance of this evidence, it makes it no less relevant.

Mr. Farwell did not kill Ms. Birchmore to prevent her from disclosing the facts of their affair. All the Court needs to do is review sealed Exhibits 11, 12, and 13 to see multiple women's accounts of their ongoing sexual relationships with the defendant while he was married.

These extramarital affairs were routine. They were brazen. They were not secrets, at least not well-kept secrets. And these details are not being offered to be salacious. They are being offered to show that this relationship with Ms. Birchmore was different. And it was different because it was exploitive, it was coercive, and it was criminal.

A 27-year-old police officer using Facebook to

friend a high school student to gain access to her through the police department explorers program, a program that she joined to provide her with stability and structure and positive role models, to take advantage of her idealization of police officers, to statutory rape her, regretting only that he didn't take her virginity even earlier in 2012 and that he didn't, quote, "fuck her without a condom from day one."

Meeting Ms. Birchmore for sex while on the clock as a Stoughton police officer during all of those years of service that you just heard about, all of those actions are crimes, and they are federal crimes. And this experienced detective, this union president, this collaborator on local and state and federal investigations knew that better than anyone.

He committed crimes, lots of crimes, federal crimes, and she was going to tell; and the only way to save himself was to eliminate that possibility of disclosure. And that fact and not the fact of some, quote, "adult affair relationship," as the defense refers to this in their filings, is why he killed her, why he traveled to her apartment unannounced in the middle of a blizzard, masked, on the eve of his wife's scheduled C-section, why he struggled with her, why he strangled her, and why he staged her.

Those multiple affairs that he has had over the

last decade may have -- may have -- ended his marriage. This relationship with Ms. Birchmore was going to end his liberty.

Evidence of that statutory raping, of that predation, of that grooming has only gotten stronger. The Court is well aware from the filings of the text messages between the defendant and Ms. Birchmore where they discussed having her skip school and her prom to have sex, where he touches her and boundary-pushes in the library, where he takes her virginity on April 10, 2013, when she was 15, telling her in a text message it was the best day of his life.

But if his words were not enough, there's now medical evidence. March 1st -- in March of 2013, she discloses to her pediatrician that she's receiving tutoring from a local police officer at the library. By May 1, 2013, she's asking to go on birth control. May 30, 2013, she confirms to a doctor that she's sexually active.

Those facts, that evidence, that's why he killed her, not just because she was some -- yet another adult affair partner. Those were routine for him. This was criminal.

And when considering whether or not the defendant poses a risk of obstruction, I would urge the Court to consider what his immediate reaction was when he learned that a report had been made to law enforcement about his

relationship with her.

On January 20, 2021, 12 days before Ms. Birchmore died, when there was a call to the Stoughton Police Department about his relationship with Ms. Birchmore, the defendant did three things. First, he immediately told the call-taker, "Do not tell anybody about this and never mention it to me again." And the Court has a report from that witness who says that the usually laid back Mr. Farwell on that day was pissed.

Second, he texted Ms. Birchmore, quote, "You told me no one knew, yet she claimed we are fucking. I literally can't believe this is even real life. Like, what else do I have to worry about now? Which other friend will do something tomorrow?"

He made sure there was not going to be another friend and there was not going to be a tomorrow. He had committed serious crimes, federal crimes. She knew about it, and she was starting to tell. So he took his third step. He came around. He did a total 180, accepted a key to her apartment, pretended to be open to co-parenting, brought her a ginger ale for her nausea. He kept her happy so that he could keep her quiet until he killed her.

The defendant obstructed justice when he killed Ms. Birchmore, when he shielded his face with a mask, entered her apartment, and strangled her to death. He then further

obstructed justice by altering his crime scene, staging it to look like a suicide.

Several months before the defendant killed Ms. Birchmore, he, as a professional detective and investigator, attended the Massachusetts State Police Homicide Conference, a training put on by some of the same detectives who would ultimately investigate the murder of Ms. Birchmore.

Phone records and multiple witnesses confirm his presence at that training, training about how to investigate homicide crime scenes. Who presented at that training? The medical examiner. Part of that training was teaching these detectives, like Matthew Farwell, how to investigate hanging deaths. See sealed Exhibit 23.

In that training, the defendant learned that ligature furrows should angle upward; the knot will be in the back of the head; that, quote, "there is no need to be fully suspended to achieve death in a hanging."

The defendant used that specialized training to attempt to obstruct justice. After killing Ms. Birchmore, he moved her body to make it appear as if she had committed suicide, and he altered a crime scene.

The defendant left Ms. Birchmore's apartment that night and continued to flirt with the obstruction of justice. February 2, 2021, when he was off duty at the hospital with

his wife, who hours before had just delivered his child, what is the defendant preoccupied with? Checking in at the Stoughton Police Department to see if there's any activity there. The Court has sealed Exhibit 3.

He asked his co-worker if he's working because he wants to know if, quote, "anything is going on," because he's, quote, "bored as hell sitting at the hospital." While the Stoughton Police Department is typically out of sight, out of mind for Mr. Farwell when he's off duty, on February 2, 2021, just an hour after his wife gives birth, he's texting a co-worker to see if anything is going on at the station; translation, to see if Sandra's body had been found yet. It had not been.

What happens when her body is found? After an employee of her condo association calls the police and tells them that he has located a video of an unknown masked man entering Sandra's apartment building in the middle of a blizzard just a couple of hours after she's last seen alive on video and officers go view that video and identify the man as the defendant, somebody who they had investigated crimes with, when they within hours of making that identification ask him to join them in the parking lot of a local elementary school, what does he do when he meets with them?

He lies and he obstructs justice. Those lies are outlined in paragraphs 91 to 100 of Exhibit 1. And those

lies are important to spend a moment on because they go directly toward his risk of obstruction.

Paragraph 92, when the defendant claims the last time he was intimate with Ms. Birchmore was October 2020, well, we know that they had sex on November 18, 2020, after he expressed in writing his happiness that he had just had specifically vaginal intercourse with her.

But they had sexual contact much more recently than that. In August of 2024, the FBI got a search warrant for the defendant's DNA; and we learned that his sperm was found in multiple locations on the underwear that she was wearing when she died. That lie to the State Police was an attempt to distance himself temporally from Ms. Birchmore, and he needed to distance himself from her because he had killed her.

Paragraph 97, he tells police representatives that Birchmore has been sectioned multiple times -- not true. Federal investigators have reviewed thousands of pages of her medical records from her birth to her death, spoken with her mental health clinicians, her OB/GYNs, her pediatrician, reviewed her college records, spoke to employees at her colleges, her family, her friends, employees at the Stoughton Police Department, people who would have records of these hospitalizations or commitments -- not a single mental health commitment.

Yes, Ms. Birchmore spent parts of her life depressed and anxious. That is no secret. And perhaps that's in part because she'd been being exploited by a local police officer since her childhood, forced to act out rape fantasies, intrafamilial rape fantasies, and receive sexual violence as a form of punishment. But depression and anxiety do not equal suicidal ideations.

The only time in Ms. Birchmore's life where she expressed suicidal ideations was four years before her death, June/July 2017, after the death of her mother and her grandmother, the two women who raised her, and the defense mentions that journal entry where she discusses her suicidal ideations, and I am asking the Court to consider that as well.

Think about how this young girl lost the two people closest to her a month apart and think about how she survived that grief. And because she would survive that low point over the next four years, she would go on to complete school, get her own apartment, get a full-time job, make close friends and, most notably, become pregnant with a healthy baby that she had been praying for.

Multiple people who have been interviewed have confirmed that if she were ever going to consider suicide, it would have been then in 2017 when she was at her lowest, when she was grieving, not in 2021 at her highest, when she was

celebrating.

The defendant took that prior vulnerability and tried to twist it and use it to save himself. He lied about, exaggerated her mental health history because he needed the police to write her off as crazy because he staged her death to make it look like a suicide.

He knew at no point during the four years leading up to her death was she suicidal. At no point during that time did he stop having sex with her long enough to call 9-1-1, her doctor, her therapist, her family, a friend, his police department.

And as he is telling the State Police about this fictitious history of mental health commitments, he's telling his friends he had no clue she was crazy, they only had drunken sex a couple of times. He cannot keep his story straight because he changes what he says depending on who he is speaking to and what is in his best interest.

The truth was irrelevant to him, and it continues to be optional as he perpetuates false narratives about Ms. Birchmore's mental health to save himself, like represented that she googled, quote, "What color is the suicide ribbon?" on February 1, 2021, out of the blue.

Forensic experts have reviewed that data. That data shows that she saw a picture on her Facebook feed of a scene with ribbons, and she began to engage in Google

searches to try to figure out what cause the ribbons signified. That wasn't a cry for help. This was a girl bored on a snow day and scrolling because she didn't know her time was precious. She didn't know that somebody else -- this defendant -- had decided that that was going to be her last day on earth.

And let's talk about a minute for what she was doing on February 1, 2021: ordering baby clothes that would be delivered after her death, making arrangements to have her car shoveled out for the impending storm so that she could go to work the next day, booking a maternity photo shoot, a Valentine's Day gender reveal, because she never in a million years thought that the sex of her baby would be revealed during post-autopsy fetal testing, discussing timing of her baby shower and how COVID may impact that.

That's what she's doing February 1st, doing laundry, ordering food, talking on the phone to multiple people, all of whom describe her as excited and happy and normal.

The defendant's lies, his obstruction, mattered. It was consequential. The defendant tells investigators that he went to the apartment that night and broke up with Ms. Birchmore, and you just heard that again from the defense.

That theory, that false suicidal motivation, was

perpetuated to the medical examiner, Exhibit 22. He tells police this breakup story on February 6, 2021; and on February 9, 2021, investigators send an email with high importance about time-sensitive information that they need to uplift to the medical examiner.

What's included in that email? That they now believe that Ms. Birchmore is having an affair with a married police officer and that she committed suicide right after he ended the relationship. Where did they get that theory from? The defendant and only the defendant.

There are no text messages from Ms. Birchmore's phone to anyone about a breakup. This girl, who tells 80 people -- literally 80 people -- about her pregnancy in the five weeks that she was alive with it, this girl, a notorious oversharer, a relentless text messenger, especially about her love life, someone who has been described by multiple witnesses as having her phone as her third appendage, that girl doesn't reach out to anybody to tell them that the defendant, who she is constantly texting about, has broken up with her.

And, in fact, she doesn't even attempt to grab her phone and text anybody about that purported suicide-triggering breakup because after the defendant leaves her apartment, she never picks up her phone again.

At 9:40 p.m., while he is still in that apartment,

that phone is placed face down, under a closet doorknob, from which she is ultimately hung; and it is never touched again, never backlit again. And that is because, before he left the apartment, he did not end things with her. He ended her.

There's also no evidence that, even if they had broken up, that this would upset her. This relationship, whose genesis was a crime, was chaotic. They broke up all the time. And on February 1, 2021, she was the most independent she had ever been. The Court has sealed Exhibit 15. She had contacted lawyers to prepare for a life independent of Matthew Farwell, to make sure that her child was provided for financially, and that she had sole custody of that child.

So when investigators put forth this theory, this time-sensitive theory to the medical examiner, that's coming from one source of evidence only: the defendant. He successfully obstructed justice for years.

How else did he obstruct justice? By deleting text messages between himself and Ms. Birchmore. On February 6, 2021, he meets with members of the Massachusetts State Police. Three days later he agrees to let them search his phone, but only for texts between him and Ms. Birchmore, texts that he knew he had deleted.

In fact, he was clear to another witness that investigators were not going to find anything on that phone

because he had, quote, "wiped that shit." That isn't being cooperative. That's being performative, and it's being obstructive.

And he could feel confident that if investigators did take the step to inspect Ms. Birchmore's phone, they were not going to find any evidence of their relationship on that either because he had routinely ordered her to delete evidence of their communications.

Recently discovered information about the defendant should also give the Court great pause in determining whether releasing him poses a risk of obstruction. It's clear from the search of his 2024 phone that while the defendant used his regular browsers for all types of searches, including searches for private things like pornography websites, when he wants to search anything related to Sandra Birchmore, her death, or the investigation into her death, he uses DuckDuckGo, a privacy app that purports to protect your data and not track your searches, and the Court has an example of that in the sealed exhibits.

Past can become prologue if given the opportunity. The defendant obstructed justice over and over again when he was faced with imminent consequences of his actions, which is exactly where he is now.

We can hope that if released to his mother he will not threaten and silence a witness like he did that

call-taker on January 20, 2021. We can hope that he won't kill a witness like he did on February 1, 2021, that he won't alter evidence like he did the crime scene or delete evidence like he did on his phone. But while hope is a nice idea, it is not a 3142(g) factor.

What are 3142(g) factors? Nature of the offense: a murder of a pregnant woman. Circumstances of the offense: a premeditated murder of a victim of his crimes to save himself from facing consequences, followed by multiple attempts to obstruct.

I won't spend much time on the other two prongs because it could be repetitive, but I will take a moment to urge the Court to consider that this defendant if released would pose a serious risk of flight.

In considering whether or not a defendant will pose a serious risk of flight, the Court cannot and must not ignore to what extent the defendant is incentivized to flee. The defendant here is facing a mandatory life sentence, and the weight of the evidence is relentless. Some of the most significant evidence comes from the areas of the case that the defendant could not obstruct.

Ms. Birchmore's phone data -- at 9:08 p.m. on February 1, 2021, just hours before his wife's C-section, the defendant text Ms. Birchmore asking to stop by out of the blue. 9:13 p.m., Ms. Birchmore and Mr. Farwell have an

exchange where he tells her he is there, and she responds that he is welcome to come up.

That is the last text message she will ever send. This girl who sends hundreds, if not thousands, of messages a day will never send another text message again after welcoming the defendant into her apartment. And her phone locks for the final time, never unlocks again.

A minute later, 9:14 p.m. the defendant's on video, masked, entering her apartment. 9:40 p.m. the phone records eight steps, and it ends up at its final resting place under a closet doorknob, face down.

The defendant is still in the apartment at that point for another three minutes. That phone never moves again, never lifted up, never backlit again. The next time anybody touches that phone is on February 4, 2021, when the police find Ms. Birchmore.

If you believe what the defendant told police and what you just heard again, that he broke up with Ms. Birchmore and she was fine, not dead, not suicidal when he left, you would have to necessarily believe that she was so distraught after their umpteenth breakup that, despite doing everything in her power to protect and cherish and plan for and celebrate her unborn baby over the last five weeks, she was so distraught over Matthew Farwell that she made the decision to end her life and her child's life -- this child

that she had been hoping for and discussing with the defendant since 2019, this baby that she and he tried to conceive month after month after month when he came and had unprotected sex with her intentionally on days that she was ovulating because the deal was he gets her pregnant, she doesn't disclose; this baby that she had researched and interviewed at day cares for, ordered baby clothes and furniture and a car seat and a stroller for, that she had planned a shower and a gender reveal and a maternity shoot and a newborn photo shoot to celebrate, this child that she had named.

She was so distraught over another routine breakup with the defendant that she ended her own life and her baby's -- didn't google how to do it ever, no research, no conversations with anybody about it, just tied herself to a doorknob and reclined -- an extraordinarily rare, almost impossible way to kill oneself, a method of suicide that most people who haven't been to a homicide training put on by the State Police and the medical examiner don't even know exists.

The problem is the evidence left behind. The evidence that survived the obstruction refutes that. Ms. Birchmore's hair had been taken down from when she was last seen on video just a couple hours before. She's found with bobby pins surrounding her body and her long hair messily and chaotically and painfully twisted and knotted

throughout the strap and the buckle; a flamingo necklace broken down the front of her chest, broken at the chain, not at the clasp, with clumps of hair in it, both obvious signs of a struggle.

Inside of Ms. Birchmore: a fractured, practically decimated hyoid bone, an acute and violent injury that is much more consistent with homicide than suicide, especially in victims under 30, whose hyoid bones are not even fully fused yet and thus are incredibly flexible and almost impossible to fracture.

He did not learn in his training and thus could not prepare for the fact that he had fractured her hyoid bone inwardly, much more consistent with strangulation than an outward or a lateral fracture.

And he left a pattern imprint on her chest. As he killed her, a particular and distinct buckle was pressed into her chest hard enough that it left significant injury through layers of clothes, leaving behind an unmistakable pattern imprint. The buckle that caused that injury to her chest was found above her head by the doorknob. In other words, as she was dying, that ligature was on a different place on her body than where it was ultimately found. She did not die in the position in which she was found. She was moved, and she was moved by the last person to see her alive.

The ligature was swabbed for DNA, specifically the

portion away from Ms. Birchmore's neck that somebody would have had to have accessed to hang there.

STR testing and Y-STR testing -- yes, Y-STR testing can only test for patrilineal lines, not the case for STR testing. And on that ligature there's one major contributor -- one: the defendant. The defendant's DNA is on the murder weapon, on part of the murder weapon used to tie her to a doorknob.

That phone activity, the injuries to her, her broken necklace, her tangled hair, the absolute lack of suicidal motivation, the abundance of homicidal motivation, his DNA on the murder weapon -- these facts may be inconvenient or uncomfortable for the defendant, but they are not fickle and they cannot be manipulated to fit a narrative, even for a war hero, a family man, and a member of law enforcement.

The only argument that the defense makes for his release is weight of the evidence, and it's based on two things: The defendant did not flee when he was under investigation originally, and the medical examiner ruled the death a suicide.

We looked into and told the defense that the medical examiner did not miss any steps based on the information she had at the time. That's what the forensic expert said. She did -- she performed the autopsy correctly.

The problem was not the medical examiner. It was the information she had or didn't have.

Having the medical examiner conduct this autopsy with such a significant lack of information and such a significant amount of misinformation renders her May 2021 conclusion at best premature.

And we know that the defendant -- and to be clear about the medical examiner, we did meet with the medical examiner twice. The first time was to make sure before we charged somebody with murder, a mandatory life sentence that at the time carried a death penalty, that we didn't miss anything, we hadn't missed anything.

And we know that the defendant did not stay local in spite of an investigation. He knew that he was not the subject of any investigation. A trooper who he knew reached out to him, asked him to meet up as soon as possible in the parking lot of an elementary school, not at the Norfolk DA's office up the street, not at the Canton Police Department down the street, not at Massachusetts State Police headquarters.

He wasn't read his *Miranda* rights. It wasn't recorded. He was not served with any search warrant to search his phone or to search his house for other devices like laptops or iPads where messages may be stored. He was not served with a search warrant for his buccal swab to

compel his DNA, not a search warrant to search his house for the clothes or the mask that he was wearing that night. No one inspected or photographed his body for signs of a struggle.

And one of the only other interviews that were conducted during that brief investigation in 2021 was of William Farwell, the defendant's twin brother, and the Court has a sealed exhibit to that effect.

When he was asked by investigators around the same time to meet with them also in a parking lot, they told him this wasn't criminal, there's no suspects, and this investigation is the last thing they needed. And one can assume that this defendant was told the same thing: not a suspect, nothing criminal, no investigation. And so lack of flight means nothing.

The first time that an independent authority starts to suggest publicly that this was a homicide, June 24, 2024, when the *Globe* and others begin to publicize a report offered by Dr. Michael Baden, an experienced and well-known medical examiner and forensic pathologist from New York City who concluded that this was a homicide.

What does the defendant do as soon as this article comes out? He writes a goodbye letter to his best friend, asks him to take care of his family, and tells him he will see him on the other side, Exhibit 21.

And the defense characterizes this as a suicide note. However the Court wants to read this, whether it's an intent to flee or an intent otherwise to not be available for trial, either way, it goes to risk of nonappearance.

The first time the walls start to close in on the defendant, what does he do? He writes a goodbye letter. The walls are much closer now. It is not just Dr. Baden. It's a federal grand jury. It's a federal indictment. It's an imminent looming trial date, and it is a mandatory life sentence.

And, finally -- I'll just spend a minute on this, Judge -- this defendant is a danger to the community. The government is alleging that when Mr. Farwell's liberty was in jeopardy like it is now, he reacted by killing a witness against him. And courts have held that a murder charge weighs substantially in finding of a favor of dangerousness.

He murdered a person because she could have been a witness against him, could have been. There are dozens of witnesses against him. His release poses a danger.

And although he was only in her apartment murdering her and staging a scene for 30 minutes, his crimes were much longer lived. He had been grooming her and raping her and then using her to act out his own violent rape fantasies for years, telling her, for example, quote, "I'll grab your throat and say, 'Shut the fuck up. This is going to happen,

so just let it, and you won't get hurt.'"

And even after he kills Ms. Birchmore, he's still not on his best behavior. And the Court can see allegations against him from the summer of 2021 in the sealed Exhibits 6, 7, and 10.

Finally, it should be clear to the Court that this defendant had both before and even after he killed Ms. Birchmore a sexual interest in children and a glorification of violence and sexual violence towards women. We have -- I have moved this Court to hold the defendant pretrial -- to hold defendants pretrial for possessing images of children.

The defendant had hands-on sexual contact with a child in 2013 when he took Ms. Birchmore's virginity. And the defendant, from what we learned earlier this month in the parts of the phone that we have been permitted to review, even after killing Ms. Birchmore, he continued to have the sexual interest in children. Exhibit 21 is an excerpt from his web search histories.

The Court can see for itself that Mr. Farwell has a continued sexual interest in, quote, "barely legal teen girls," especially, quote, "teens from fucked-up families," searching for big brother, little sister, stepdad, stepdaughter rape fantasies, the same type of fantasies he spent years acting out with Ms. Birchmore before he killed

her.

The defense motion and the defense argument spent a lot of time describing the defendant's accomplishments. He may be -- may be -- a war hero, a former police officer, and a family man; and that pedigree just might -- may have earned him three years of liberty that most people who commit premeditated murder of pregnant women do not get.

But he now stands charged awaiting the consequences of his actions, of his grooming, of his raping, of his stealing, of his lying, and of his murder. Now is not the time to test whether or not he will yet again obstruct justice, whether or not he will again endanger a member of the community, and whether or not he will flee or otherwise not appear to avoid the mandatory life sentence that would await him after a conviction.

THE COURT: Yes. Thank you.

MS. DALEY: Your Honor, I just need to respond briefly and correct a couple of things.

The government just represented that Sandra Birchmore's mental health history, or at least her history of suicidal ideation, ended in 2017, that she went to college, that she moved on with her life, and had no other suicidal ideation and no mental health hospitalizations.

March 28, 2019, while she was a student at UMass Dartmouth, she signed -- filled out and signed a release form

for UMass Dartmouth Counseling and Student Development office, which reads: "I, Sandra Birchmore, have been informed that I need to meet with a therapist at the UMD Counseling and Student Development Center due to my recent trip to the hospital for mental health concerns. I am declining to meet with a therapist for an aftercare appointment," dated March 28, 2019.

The government knows she had suicide flags on her college records and, in fact, reached out to her therapist asking her to intervene to remove them. So her mental health history, her history of suicidal ideation, did not end with the death, unfortunate death, of her family members. It continued.

And while she may have made plans for this child, may have ordered baby clothes, suicide is an impulsive act. It is one that is taken by people tragically when they are seemingly in the midst of making plans for the future, and that is what happened here.

And the government -- I appreciate them putting out that -- representing that they met with the Office of the Medical Examiner twice and that they shared at the first meeting that they wanted to make sure that she hadn't missed anything.

We'll have to take the government's word for that because the government also chose not to take any notes or

write any report of that meeting, so we have no idea what was actually said at that first meeting or at the second meeting or what then transpired at a third meeting with a third medical examiner, all of whom now have all of the evidence in this case, all of whom continue to say the manner of death in this case was suicide.

Other evidence the government is pointing to, the pattern evidence, a necklace -- a necklace, by the way, which is not in evidence in this case, has not been preserved by the government -- all of this known to the actual forensic pathologist; and while Dr. Baden is, certainly, by trade, a forensic pathologist, he hasn't been retained by the government in this case as far as the defense knows. Instead, they have retained a doctor of emergency medicine.

Your Honor, the government's case, obviously, is what it is; but this prosecution, I would submit, is unconventional in the sense that this Court, I'm sure, has seen many defendants come through charged with homicide. And the conventional route of that prosecution is defendant is arrested because a medical examiner has concluded that it is homicide. And perhaps that defendant, having been arraigned, having been charged, then hires an expert. And perhaps that expert says, "No, I say it's suicide." That is the conventional prosecution of murder cases, I would submit.

But what's interesting is that the government is

asking the Court to rely upon what would otherwise be a defense expert, a private third-party defense expert, who is not even a forensic pathologist. And the media has eaten it up.

And the reports in this case -- and, again, not that this Court is influenced at all by media coverage, but the fact that it has been reported repeatedly as Mr. Farwell's case was initially ruled a suicide until further investigation determined it was a homicide, had Mr. Farwell been charged with homicide in the initial reports from the medical examiner, the continued conclusion of the medical examiner was this is a homicide, and Mr. Farwell hired an expert who said, no, it's suicide, those news reports wouldn't change. It wouldn't be, well, this third expert says suicide; therefore, it's not a homicide anymore. But that's -- even though the defendant is presumed negligent.

But that is what the government is asking the Court to do, to disregard the fact that at least two medical examiners continue to opine that it is a suicide, and that is what it is.

And the defendant has the right to be out of custody, to challenge the evidence as the government continues, as they say, to produce every single day. And the defense team does not want to delay this trial. And having

the defendant at liberty at home where we can see him --

And, no, we cannot go to Wyatt 24 hours a day. Wyatt is locked down for hours at a time. Wyatt has shift changes. Wyatt has freeze counts. I know. I've been stuck at Wyatt during freeze counts and lockdowns. So, no, it is not the same thing; and the Court should take that into consideration, because this team is determined to try this case in October, to prove that Mr. Farwell is innocent. And having him at liberty so he can assist in his defense is a worthy reason for this Court to release him.

Thank you.

THE COURT: Okay. All right. So I'm going to take this under advisement. And thank you very much, everyone.

(Court in recess at 11:00 a.m.)

**CERTIFICATE OF OFFICIAL REPORTER**

I, Robert W. Paschal, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 4th day of May, 2026.

/s/ Robert W. Paschal

ROBERT W. PASCHAL, RMR, CRR
Official Court Reporter